UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LM GENERAL INSURANCE COMPANY; LM INSURANCE CORPORATION; LIBERTY MUTUAL PERSONAL INSURANCE COMPANY; and SAFECO INSURANCE COMPANY OF ILLINOIS, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| NORTHLAND RADIOLOGY, INC.; GREAT LAKES PAIN & INJURY CENTERS LLC; PIONEER LAB HOUSTON LP; LIVE WELL HEALTH, LLC; KEVIN T. CRAWFORD, D.O., P.C.; MICHIGAN BUSINESS MANAGEMENT GROUP INC.; MED CARE WELLNESS, INC.; MILAN GANDHI; GIOVANNY RODRIGUEZ; and KEVIN CRAWFORD, D.O., | |
| Defendants. | |

## COMPLAINT

Plaintiffs LM General Insurance Company, LM Insurance Corporation, Liberty Mutual Personal Insurance Company, and Safeco Insurance Company of Illinois (collectively, "Liberty Mutual" and/or "plaintiffs") hereby allege as follows.

1

## I.   <u>INTRODUCTION</u>

1.     This is a case about a medical clinic and magnetic resonance imaging ("MRI") facility, a physical therapy clinic, a drug testing laboratory, a chiropractic clinic, an orthopedic surgeon, an unlicensed pharmacy, and a durable medical equipment ("DME") supplier and their owners, managers, agents, and representatives who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Liberty Mutual by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking to collect payment from Liberty Mutual for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act.

2.     Defendants Northland Radiology, Inc. ("Northland"), Great Lakes Pain & Injury Centers LLC ("Great Lakes"), Pioneer Lab Houston LP ("Pioneer Lab"), Live Well Health, LLC ("Live Well"), Kevin Crawford, D.O., P.C. ("Crawford P.C."), Michigan Business Management Group Inc. ("MBMG"), Med Care Wellness, Inc. ("Med Care"), Milan Gandhi ("Gandhi"), Giovanni Rodriguez ("Rodriguez"), and Kevin Crawford, D.O. ("Crawford") (collectively, the

"defendants") each conspired to, and did in fact, defraud Liberty Mutual by perpetuating an insurance fraud scheme in violation of federal and state law.

3. The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Liberty Mutual to and on behalf of the defendants pursuant to Michigan's No-Fault Act.

4. All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5. By this Complaint, and as detailed in each count set out below, Liberty Mutual brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Liberty Mutual also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6. As a result of the defendants' fraudulent acts, Liberty Mutual has paid in excess of $1,404,320 to them related to the patients at issue in this Complaint.

## II. **THE PARTIES**

### A. **PLAINTIFFS**

7. LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois are companies duly organized and existing under the laws of the State of Illinois.

3

8.     Liberty Mutual Personal Insurance Company is a company duly organized and existing under the laws of the Commonwealth of Massachusetts.

9.     LM General Insurance Company, LM Insurance Corporation, Liberty Mutual Personal Insurance Company, and Safeco Insurance Company of Illinois each have their respective principal places of business in Boston, Massachusetts.

10.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

**B.     DEFENDANTS**

### 1.     Northland Radiology, Inc.

11.     Defendant Northland Radiology, Inc. is incorporated under the laws of the State of Michigan.

12.     Northland's principal place of business is in Southfield, Michigan.

13.     At all relevant times, Northland was operated and conducted by defendants Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, Med Care, Gandhi, Rodriguez, and Crawford.

14.     Northland billed Liberty Mutual for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Liberty Mutual insureds, including the patients identified in Exhibit 1.

### 2.    Great Lakes Pain & Injury Centers LLC

15.    Defendant Great Lakes Pain & Injury Centers LLC is a limited liability company organized under the laws of the State of Michigan.

16.    The member of Great Lakes is Giovani Rodriguez, who is a citizen of the State of Florida.

17.     At all relevant times, Great Lakes was operated and conducted by defendants Northland, Live Well, Gandhi, and Rodriguez.

18.    Great Lakes billed Liberty Mutual for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Liberty Mutual insureds, including the patients identified in Exhibit 2.

### 3.    Pioneer Lab Houston LP

19.    Defendant Pioneer Lab Houston LP is a limited partnership formed and existing under the laws of the State of Texas.

20.    Pioneer Lab was authorized to do business in Michigan under the assumed name of Pioneer Lab Houston Partnership on September 2, 2021.

21.    The General Partner of Pioneer Lab is SP Healthcare Holding LLC, a limited liability company organized under the laws of the State of Texas.

22.    SP Healthcare Holding LLC's member is Sourabh Sanduja, who is a citizen of the State of Texas.

23.     Pioneer Lab's principal place of business is in Baytown, Texas.

24.     At all times relevant to the allegations set forth herein, Pioneer Lab intentionally sought to and did do business in the State of Michigan, including with respect to the conduct discussed herein.

25.     At all relevant times, Pioneer Lab was operated and conducted by defendants Northland and Gandhi.

26.     Pioneer Lab billed Liberty Mutual for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Liberty Mutual insureds, including the patients identified in Exhibit 3.

### 4.      Live Well Health, LLC

27.     Defendant Live Well Health LLC is a limited liability company organized under the laws of the State of Michigan.

28.     The member of Live Well is Giovani Rodriguez, who is a citizen of the State of Florida.

29.     At all relevant times, Live Well was operated and conducted by defendants Northland, Great Lakes, Gandhi, and Rodriguez.

30.     Live Well billed Liberty Mutual for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful

in relation to several Liberty Mutual insureds, including the patients identified in Exhibit 4.

### 5.    Kevin Crawford, D.O., P.C.

31.    Defendant Kevin Crawford, D.O., P.C. is incorporated under the laws of the State of Michigan.

32.    Crawford P.C.'s principal place of business is in Wayne, Michigan.

33.    At all relevant times, Crawford P.C. was operated and conducted by defendants Northland, Gandhi, and Crawford.

34.    Crawford P.C. billed Liberty Mutual for services that were unlicensed, medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Liberty Mutual insureds, including the patients identified in Exhibit 5.

### 6.    Michigan Business Management Group Inc.

35.    Defendant Michigan Business Management Group Inc. is incorporated under the laws of the State of Michigan.

36.    MBMG's principal place of business is in Dearborn, Michigan.

37.    At all relevant times, MBMG was operated and conducted by defendants Northland and Gandhi.

38.    MBMG billed Liberty Mutual for services that were unlicensed, medically unnecessary (to the extent they were rendered at all), and were unlawful

in relation to several Liberty Mutual insureds, including the patients identified in Exhibit 6.

### 7. Med Care Wellness, Inc.

39.    Defendant Med Care Wellness, Inc. is incorporated under the laws of the State of Michigan.

40.    Med Care's principal place of business is in Warren, Michigan.

41.    At all relevant times, Med Care was operated and conducted by defendants Northland and Gandhi.

42.    Med Care billed Liberty Mutual for services that were unlicensed, medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Liberty Mutual insureds, including the patients identified in Exhibit 7.

### 8. Milan Gandhi

43.    Defendant Milan Gandhi is a resident and citizen of the State of Michigan.

44.    At all times relevant to this Complaint, Gandhi operated and conducted defendants Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, and Med Care.

### 9.   **Giovanni Rodriguez**

45.   Defendant Giovanni Rodriguez is a resident and citizen of the State of Florida.

46.   At all times relevant to this Complaint, Rodriguez operated and conducted defendants Northland, Great Lakes, and Live Well.

### 10.   **Kevin Crawford, D.O.**

47.   Defendant Kevin Crawford, D.O. is a resident and citizen of the State of Michigan.

48.   At all times relevant to this Complaint, Crawford operated and conducted defendants Northland and Crawford P.C.

## III.   **JURISDICTION AND VENUE**

49.   Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

50.   Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

51.   Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

52.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

53.    The defendants used the RICO enterprises discussed herein – Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, and Med Care – to submit exorbitant charges to Liberty Mutual for purported medical services, procedures, testing, devices/equipment, and medications that were not actually provided, were unlicensed, were not medically necessary, and were fraudulently billed.

54.    The purpose of the scheme was to generate the highest possible amount of charges to Liberty Mutual to abuse the Michigan No-Fault Act.

55.    The defendants are all interrelated, and utilized defendant Northland both to generate bills for medically unnecessary services and to direct patients to the other RICO enterprises for medically unnecessary and unlawful treatment, testing, and services.

56.    The fraudulent scheme described herein was driven by Northland, which is solely owned and controlled by laypersons in violation of Michigan law.

57.     Northland has represented in filings with the State of Michigan that its sole shareholder is Prakash Gandhi, who is the father of defendant Milan Gandhi, and who holds no medical licensure.

58.     Defendant Milan Gandhi, who also holds no medical licensure, controlled the day-to-day operations of Northland, including the scheme to defraud Liberty Mutual described in detail by this Complaint.

59.     The scheme was implemented by Northland's physicians, including Benjamin Krpichak, M.D. ("Krpichak"), who oversaw the predetermined treatment protocols that included aggressively billing for medical services that were unnecessary and unsupported by standards of care and patient conditions, and referral of patients to the other defendants for unnecessary and fraudulent medical treatment and services.

60.     The defendants' predetermined treatment protocol included frequent, excessive, and unnecessary office visits during which the defendants made non-specific diagnoses in order to create the appearance of necessity of treatment and testing billed to Liberty Mutual that was not actually supported by clinical findings or medical evidence, and which were fraudulently billed to Liberty Mutual as described below.

61.     This protocol also included orders for excessive and unnecessary MRIs, CT scans, urine drug testing ("UDT"), electrodiagnostic testing, durable medical

equipment ("DME"), extensive physical therapy, chiropractic, disability findings, and prescriptions for numerous medications without regard to whether such treatment benefitted patients.

62.    The defendants' predetermined treatment protocol also included routine internal pain management referrals to other Northland doctors who implemented a treatment protocol that included pressuring patients to undergo as many injections, repeated injections, and related procedures as possible, without regard to the patients' actual conditions or clinical diagnoses, and regardless of whether previous injections and procedures were effective.

63.    One patient who was subjected to Northland's extreme orders for MRIs and other testing, and who was pressured to undergo injections, later reported that he was "hijacked" by Northland and that he only agreed to undergo the services because he was in a state of "confusion and shock" about what was being recommended.

64.    The defendants could not have conducted the scheme described herein without each other's participation.

65.    For example, defendant Great Lakes, which is located in a building adjacent to Northland's office location, submitted billing to Liberty Mutual with respect to twenty-six (26) different Liberty Mutual insureds at issue in this litigation, twenty-five (25) of whom also had billing submitted by Northland, a 96% correlation

that confirms the defendants' practice of referring patients between one another in order to generate additional unnecessary billing under the No-Fault Act.

66.    Defendant Pioneer Lab has submitted billing to Liberty Mutual with respect to forty-four (44) different Liberty Mutual insureds at issue in this litigation, forty-two (42) of whom also had bills submitted by Northland, a 95% correlation.

67.    Defendant Live Well, which is also located immediately adjacent to defendant Northland, submitted billing to Liberty Mutual with respect to thirty (30) different Liberty Mutual insureds at issue in this litigation, twenty-seven (27) of whom also had bills submitted by Northland, a 90% correlation.

68.    Defendant Crawford P.C. billed Liberty Mutual with respect to twenty-eight (28) patients at issue herein, sixteen (16) of whom were also patients of defendant Northland, a 57% correlation.

69.    Out of 68 patients for whom defendant MBMG has submitted bills to Liberty Mutual since June 12, 2019, Northland also submitted billing with respect to 44 of those patients, which represents a correlation of more than 65%.

70.    Finally, out of twenty-eight (28) patients for whom defendant Med Care has billed Liberty Mutual, sixteen (16), or 57%, were also patients of Northland.

71.    The above listed associations confirm that the defendants operated a closed system of referrals whereby they each profited from the medically

unnecessary and improper diagnoses, orders, and referrals made by and to each other.

72.    Defendants Great Lakes and Live Well, which have the same physical location, also worked cooperatively to submit separate bills for treating the same patients on the same dates of service for purported treatments that would not be permitted to be billed together if a single bill was submitted by one provider.

73.    This co-dependent relationship, which is addressed in further detail below, is further evidenced by the fact that 96% of the patients for whom Great Lakes submitted bills also had bills submitted to Liberty Mutual by Live Well.

74.    As detailed below, this system resulted in millions of dollars of bills to Liberty Mutual for services that were excessive, unnecessary, and contrary to standards of care, to the extent the services billed were provided at all.

75.    That the services at issue herein originated with the predetermined treatment protocol established and implemented by defendant Northland is particularly egregious because Northland is owned and controlled by a layperson, defendant Gandhi, along with his layperson family members, who possesses no qualifications to direct medical treatment.

76.    As a result of their relationship and shared control, the defendants and their associates had a significant financial motivation to bill Liberty Mutual for as many services, testing, procedures, and medications as possible, all at

14

unconscionable rates and regardless of medical need and applicable standards of care.

77.    The defendants' bills and associated records were sent to Liberty Mutual through faxes over interstate wires and the U.S. Mail, and Liberty Mutual relied on the faxes and mailings sent by the defendants in adjusting and paying insurance claims.

## V.    BILLING FOR SERVICES NOT RENDERED

78.    The defendants regularly submitted bills to Liberty Mutual seeking payment for treatment and services that were never rendered to patients at issue herein.

79.    The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

80.    All of the bills submitted by the defendants to Liberty Mutual through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

81.    Liberty Mutual is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover

any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

### A.    BILLING FOR IMAGING NOT PERFORMED

82.    The bills and invoices submitted to Liberty Mutual by the defendants contained Current Procedural Terminology ("CPT")[1] codes that were intended to identify the procedure or medical service claimed to have been provided by the defendants.

83.    The Health Insurance Claim Forms ("HICFs") used by the defendants to submit bills to Liberty Mutual included language certifying that the services billed were "medically indicated and necessary to the health of this patient" and were actually furnished to the patient.

84.    Northland frequently billed Liberty Mutual using CPT codes for imaging and other services that it never actually performed.

85.    As detailed below, because Northland operates its own MRI and bills extraordinary amounts for each MRI allegedly performed, a significant part of its predetermined treatment protocol was to order MRIs of every part of a patient's body for which they allegedly had pain, regardless of how minor and regardless of whether they had attempted any conservative treatment, at patients' initial appointments.

---

[1] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

86.     These indiscriminate orders for MRIs in blatant disregard for medical standards resulted in hundreds of thousands of dollars in bills for unnecessary imaging submitted to Liberty Mutual.

87.     In many cases, the MRIs were not actually performed at all.

88.     For example, Northland billed for seven (7) alleged MRIs to patient J.G. (Claim No. 045577874)[2] on November 4, 2021, which was also the date of his initial evaluation, of his lumbar spine, chest, cervical spine, brain (both MRI and MRA), right shoulder, and right wrist.

89.     J.G. testified that he had a clear recollection of both the imaging performed and his discussions with Krpichak of the results, and that the only body parts imaged at Northland were his right wrist, right shoulder, and lumbar spine.

90.     On July 14, 2020, Northland billed for performing both a left knee MRI and a right knee MRI on patient J.S. (Claim Number 039510452).

91.     However, only a left knee MRI was ordered for J.S., and only a left knee MRI was performed.

92.     On May 17, 2021, Northland billed for an outrageous eight (8) separate MRIs of patient D.S. (Claim No. 045425213) on the same day that was less than a

---

[2] To protect the confidentiality of the patients at issue herein, Liberty Mutual refers to them by initials and Liberty Mutual claim number.

month after an alleged motor vehicle accident and before D.S. attempted any significant conservative treatment.

93.     D.S. testified that he did not recall whether he was taken in and out of the MRI machine during these eight (8) alleged procedures to different body parts, but if he was taken out and placed back in it was only done once, which would not have allowed for the actual imaging of body parts as diverse as his head, spine, and limbs.

94.     D.S. also testified that it was never explained to him what body parts were being imaged or why, or what the results of the scans were.

95.     The experience related by D.S. was repeated with respect to numerous patients at issue herein, who were immediately directed to undergo MRIs upon presentation to Northland but did not know of what body parts and were not taken in and out of the MRI machine to be repositioned for each different MRI.

96.     Northland also billed for components of alleged imaging services that were not performed.

97.     For example, Northland often billed for the alleged performance of arthrogram imaging, which entails injecting the patient with contrast dye before imaging, which can be done via CT scan, MRI, or x-ray.

98.    Northland misrepresented the types of arthrograms performed and billed for components that were not actually done, in addition to fraudulently unbundling charges as discussed in detail below.

99.    As one example, Northland billed for an alleged CT arthrogram to patient C.A. (Claim No. 043319371) on September 21, 2020.

100.    Among the charges billed by Northland were claims for a CT scan, two (2) x-rays, fluoroscopic guidance, a shoulder injection, and two (2) substances allegedly injected, most of which are fraudulently unbundled.

101.    However, the report of the procedure does not document performance of x-rays at all, which also would have been unnecessary anyway since the procedure was a CT arthrogram (not a radiographic arthrogram).

102.    Northland also billed for epidurograms that were not actually performed in connection with its excessive and unnecessary pain management injections.

103.    An epidurogram is a procedure that involves injecting dye into the area to be injected to obtain information about the patient's anatomy before a procedure.

104.    Epidurograms are rarely necessary, particularly when a patient has already had imaging done of the area to be injected.

105.   Because Northland billed for imaging every area of every patient's body in which any minor pain complaints were registered, epidurograms were never necessary for the patients at issue herein.

106.   Further, when Northland billed for epidurograms, they were not actually performed.

107.   To bill for an epidurogram, the record must, at a minimum, contain a radiologic report describing the performance of the purported imaging, which Northland did not create.

108.   As just one example, Northland billed for a purported epidurogram in relation to an alleged caudal epidural steroid injection to patient R.H. (Claim No. 045138759) on October 8, 2021, and not only was there no radiologic report describing the procedure, there was no mention of performing anything that could be characterized as an epidurogram at all.

109.   Northland routinely used esoteric billing through numerous codes to add charges to its bills for imaging and other services that were not actually performed and Liberty Mutual is entitled to repayment of all amounts it was induced to pay through such fraudulent submissions.

### B.   BILLING FOR PHYSICAL THERAPY NOT PERFORMED

110.   Defendant Great Lakes billed for physical therapy that it never actually performed.

111.   Many of the alleged services billed by Great Lakes required skilled, one-on-one attention from a licensed therapist in order to be billed, including bills for therapeutic exercises, which were the most commonly billed service by Great Lakes.

112.   One-on-one treatments, including therapeutic exercises, are also timed services that cannot be billed unless the provider spends the requisite amount of time rendering the services.

113.   Each unit billed of a one-on-one physical therapy modality represents fifteen (15) minutes of treatment, and a unit may be billed if the time spent is longer than the mid-point (i.e., eight (8) minutes).

114.   Though a single unit of a timed modality may be billed after eight (8) minutes of service, subsequent units require the full fifteen (15) minutes of the previous unit(s) to be performed such that two (2) units may not be billed unless twenty-three (23) minutes of service was performed, three (3) units may not be billed unless thirty-eight (38) minutes of services was performed, and so on.

115.   Great Lakes routinely billed for units of therapeutic exercise when less than the required amount of time was performed.

116.   For example, Great Lakes billed for three (3) units of therapeutic exercise – at an unreasonable and excessive rate of $150 per unit – for treatment allegedly rendered to patient R.H. (Claim No. 045138759) on numerous dates of

service, including September 8, 10, 15, 20, and 29, 2021, when it only actually performed thirty-five (35) minutes of treatment.

117.   Further, in order to properly bill for one-on-one therapeutic exercises, the documentation must clearly indicate the need for the procedure and have evidence to support one-on-one care requiring the skills of a therapist.

118.   Great Lakes never documented the reasons that patients needed one-on-one skilled attention and never recorded what, if anything, patients actually performed that they represented to be billable therapeutic exercises.

119.   For example, patients do not need to be re-taught how to use a static bike or treadmill at every visit, making it inappropriate to include time performing these types of exercises as skilled, one-on-one therapy.

120.   Nor is time billable when spent transitioning between exercises, taking breaks, or otherwise not actively undergoing treatment.

121.   In addition to billing for services that clearly could not satisfy the time component for one-on-one services even if it were assumed treatment was actually performed, Great Lakes never documented the actual performance of billable one-on-one services and such purported treatments cannot be considered to have been performed.

122.   Great Lakes also billed for specific services that were not performed outside of the routine practices described above.

123.   For example, Great Lakes billed for physical therapy allegedly rendered to patient J.S. (Claim No. 036923239) on May 14, June 1, and June 5, 2018, before she stopped going to Great Lakes because the treatment was making her pain worse.

124.   On each date of service with respect to J.S., Great Lakes billed for providing ultrasound therapy, yet J.S. testified under oath that she never received ultrasound therapy at Great Lakes.

### C.   BILLING FOR DRUG TESTING NOT PERFORMED

125.   As detailed below, the defendants abused and misused orders for drug testing in order to generate massive amounts of charges to Liberty Mutual for patients who were not even prescribed medications.

126.   Usually, Northland claimed to obtain urine specimens from patients which it represented were sent to Texas for analysis by defendant Pioneer Lab, which in turn billed Liberty Mutual thousands of dollars per specimen.

127.   However, on several occasions, the requisition forms (i.e., prescriptions) filled out by Northland reported that testing was done via "swab" instead of urine specimen.

128.   Even when this different collection method was used, Pioneer Lab still billed for the same alleged tests, including tests that could not have been performed on a saliva sample.

129.   For example, on March 12, 2021 and March 26, 2021, Northland reported that a "swab" was used for drug testing of patient T.T. (Claim No. 044579850).

130.   Pioneer Lab billed for testing these saliva collections as if they were urine specimens, including charges for tests intended to test the validity of a urine specimen by analyzing its creatinine and pH levels (both of which would also have been fraudulently unbundled if actually done, as detailed below).

131.   These tests could not have been performed on a saliva sample collected from a swab, and it is highly unlikely that any of the tests billed by Pioneer Lab for these collections were done at all.

132.   Moreover, Pioneer Lab billed for purported tests of substances that were not actually done.

133.   For both the March 12, 2021 and March 26, 2021 purported tests of T.T.'s samples, Pioneer Lab charged for allegedly testing for the presence of barbiturates and cannabinoids, neither of which was actually done at all.

134.   Pioneer Lab also charged for the alleged tests of "alkaloids, not otherwise specified," despite the fact that testing of any substances that could have been classified as alkaloids were included in the other charges submitted by Pioneer Lab.

24

135.   Pioneer Lab typically submitted numerous separate charges for each urine specimen allegedly tested in order to bill Liberty Mutual as much as possible for these unnecessary tests.

136.   However, Pioneer Lab also routinely billed for urine drug testing using a single code, G0483, which describes testing twenty-two (22) different drug classes.

137.   When Pioneer Lab billed using G0483, it did not actually perform tests of twenty-two (22) different drug classes, as many of the substances for which it claimed to test, such as various types of opioids and anti-depressants, fell into the same drug class.

138.   Pioneer Lab billed Liberty Mutual at least $2,262, and often as much as $3,500, for these purported tests using G0483, for a total amount charged of at least $165,800, none of which was actually performed as billed.

### D.   BILLING FOR SUBSTANCES NOT USED DURING PROCEDURES

139.   When the defendants successfully pressured patients to undergo unnecessary invasive procedures as detailed below, they submitted a raft of charges for improper and unbundled services, and often also for components and supplies that were not used or provided at all.

140.   Northland routinely billed incredible amounts for alleged injections using billing codes that represented that specific amounts of such substances were used that far exceeded the amounts that were actually used.

141.   For example, on February 15, 2022, Northland billed for allegedly injecting the same steroid solution into two (2) areas of C.H.'s (Claim No. 045651558) shoulder.

142.   The solution allegedly injected was a mixture that included ten (10) milliliters of bupivacaine and forty (40) milligrams of kenalog (though less of the substance was actually injected, if any was injected at all).

143.   Northland billed $1,150 using a billing code that represented thirty (30) milliliters of bupivacaine was used.

144.   Northland also improperly billed for lidocaine that it claimed was used as a local anesthetic, which should not have been separately billed at all as using local anesthetic is a necessary component of the procedure itself.

145.   Northland billed $2,400 for four (4) units of a code representing the use of ten (10) milligrams of lidocaine (for forty (40) total milligrams) despite claiming to have used just three (3) milliliters of a solution containing 1% lidocaine per injection (for a total of six (6) milliliters for the procedure).

146.   Northland also billed $920 for what it reported was zero point five (0.5) milliliters of contrast material injected into each part of the shoulder but billed for two (2) units of such material using a code representing 300-399 milligrams per milliliter.

147.   Northland's misrepresentations about the amount of substances used during procedures resulted in thousands of dollars of charges for medications not actually used for this single procedure, and the practice was repeated scores of times with respect to the patients at issue in this action.

148.   On January 20, 2022, Northland improperly billed for even more lidocaine that was not actually used in relation to an injection to C.H.'s knee, charging for six (6) units of the substance when only one (1) milliliter was allegedly injected in three (3) areas of the knee.

149.   Further, for the January 20, 2022 procedure, Northland again billed for two (2) units of contrast material despite, at most, only one (1) injection of contrast material being used.

### E.   BILLING FOR DURABLE MEDICAL EQUIPMENT SERVICES NOT PROVIDED

150.   Defendant Med Care billed Liberty Mutual for services associated with its alleged provision of unlicensed DME to patients that were not actually provided.

151.   For example, on September 11, 2020, Med Care allegedly supplied a cervical pillow and lumbar wedge pillow to patient X.L. (Claim No. 042890332).

152.   Although the only DME allegedly supplied to X.L. was two pillows, Med Care billed Liberty Mutual for delivery, set up, and training with respect to that DME, despite the fact that the items in question could not possibly have required any set up or patient training.

27

153.   As another example of this practice, Northland prescribed a cervical pillow for patient R.H. (Claim No. 054138759) on March 29, 2021 that was allegedly supplied by Med Care on April 5, 2021.

154.   Med Care billed Liberty Mutual $500 for the cervical pillow, which can be purchased at a retail price of approximately $25 to $35, and billed an additional $100 for delivery, set up, and training for the cervical pillow that could not have been actually provided.

## VI.   UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

155.   The defendants violated several Michigan laws and regulations in their effort to bill Liberty Mutual as much as possible, including laws and regulations requiring licensure for the lawful provision of medical treatments and services.

### A.   UNLICENSED PRACTICE OF PHARMACY BY MBMG

156.   MBMG submitted to Liberty Mutual bills, records, and other medical documentation for services that were not compensable under Michigan's No-Fault Act because they were not lawfully rendered.

157.   The State of Michigan prohibits the operation of a pharmacy unless licensed by the Board of Pharmacy.  Mich. Comp. Laws § 333.17741(1).

158.   Michigan defines a pharmacy as "a facility or part of a facility that is licensed under this part to dispense prescription drugs or prepare prescription drugs for delivery or distribution."  Mich. Comp. Laws § 333.17707(6).

159.   The "practice of pharmacy" includes the interpretation and evaluation of a prescription and the compounding, dispensing, safe storage, and distribution of drugs and devices.  Mich. Comp. Laws § 333.17707(8).

160.   MBMG submitted bills to Liberty Mutual for drugs it allegedly dispensed to Liberty Mutual insureds, but MBMG does not possess a pharmacy license from the State of Michigan.

161.   MBMG has billed Liberty Mutual more than $527,619 since June 12, 2019, for allegedly dispensing medication prescribed by Northland and other providers without possessing a license to do so.

162.   Dispensing medication without a pharmacy license is unlawful in Michigan.

163.   As such, Liberty Mutual is not obligated to pay any pending bills for medication dispensed or distributed by MBMG and is entitled to restitution for those bills for which it has already tendered payment.

### B.   UNLAWFUL AND UNLICENSED ISSUANCE OF DME

164.   In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

165.   A license from the Michigan Board of Pharmacy is required for all "drugs and devices manufactured, distributed, prescribed, dispensed, administered, or issued in this state . . . ."  Mich. Comp. Laws § 333.17722.

166.   Defendants Crawford P.C. and Med Care routinely billed Liberty Mutual for purportedly dispensing and issuing DME to patients at issue herein.

167.   Neither Crawford P.C. nor Med Care ever possessed a license to issue DME in the State of Michigan at any time relevant to this action.

168.   Despite having no license to issue DME, Crawford P.C. has billed Liberty Mutual more than $70,405 and Med Care has billed Liberty Mutual more than $42,600 for DME purportedly issued to patients at issue herein.

169.   Because Crawford P.C. and Med Care did not possess a license to issue DME, their bills for purportedly doing so were unlawful and not compensable under the No-Fault Act.

170.   Liberty Mutual is not required to pay Crawford P.C. or Med Care for DME issued without a license and is entitled to restitution for payments it was induced to make by Crawford P.C.'s and Med Care's fraudulent bills.

## VIII.  UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

171.   The defendants' willingness to bill for services that were never rendered or that were rendered unlawfully demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

172.   The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care,

recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Liberty Mutual.

173.   The defendants' purported treatment also violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

174.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Liberty Mutual until it undertook the full investigation that culminated in the filing of this action.

175.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 7.

176.   All of the claims submitted by the defendants to Liberty Mutual through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

177.   Liberty Mutual is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

178.   None of the facts set out in the section above were known to Liberty Mutual until it undertook its investigation that resulted in the commencement of this

action, and are not evident within the four corners of the medical records and bills submitted to Liberty Mutual by the defendants.

## A.   THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

179.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive evaluation, treatment, and testing.

180.   The defendants' treatment protocol was characterized by an initial evaluation of patients at Northland, at which time Northland (1) made generalized, vague diagnoses of multiple alleged strains, sprains, and radiculopathy, (2) ordered immediate diagnostic testing, typically consisting of multiple MRIs and/or CT scans, (3) pressured patients to undergo immediate injections, (4) prescribed physical therapy, typically three times a week for an initial period of four to six weeks that was often billed by defendant Great Lakes, (5) prescribed multiple medications that were allegedly provided to patients at Northland's office and billed by MBMG, including Norco and other narcotics, (6) automatically ordered extensive panels of presumptive and definitive drug testing, billed by defendant Pioneer Lab, (7) automatically ordered various items of DME, typically including back braces and therapeutic pillows, that were then billed by Northland and Med Care, and (8) referred patients for unnecessary surgical procedures billed by Crawford P.C.

181. As part of the defendants' predetermined treatment protocol, patients also were scheduled to undergo frequent reevaluations at Northland, at least every two (2) to four (4) weeks, and many times on a weekly basis, whether or not there was any medical need for such reevaluations.

182. The defendants used these frequent reevaluations as their opportunity to order additional injections, urine drug testing, electrodiagnostic testing, and MRIs; to prescribe frequent and unnecessary refills of medications; and to order continued physical therapy without regard to medical necessity.

183. The defendants also utilized the patient reevaluations to make pain management referrals to other Northland physicians, who invariably recommended numerous additional injections and surgical procedures that were not warranted by the clinical examinations, were made prior to allowing conservative treatment such as physical therapy time to be effective, and that were made whether or not conservative treatments had proven beneficial or the patient's condition was improving.

184. Despite these excessively frequent patient evaluations, patients were often diagnosed with nothing more than "pain" in various body parts, which is not a diagnosis at all but rather a subjective complaint purportedly reported by the patient.

185. When Northland did make actual diagnoses of medical conditions, they were fabricated, exaggerated, and not supported by medical evidence.

186.   Radiculopathies were commonly diagnosed among those patients who were claimed to have more than just "pain," but were not actually supported by evaluation and testing.

187.   Radiculopathy describes injury to nerves in the spinal column that causes presentation of symptoms in the other body parts to which the injured nerve travels.

188.   A proper diagnosis of radiculopathy requires the performance of a neurologic examination to determine whether a patient's symptoms correspond to specific vertebral levels that are suspected to be injured.

189.   Diagnoses of radiculopathies are confirmed through additional testing, including electrodiagnostic tests and diagnostic injections.

190.   Rather than perform detailed neurologic examinations and confirmatory tests, Northland diagnosed patients with radiculopathies without any supporting evidence because such diagnoses gave the appearance that other services ordered and billed, including extreme numbers of MRIs and invasive procedures, were warranted.

191.   For example, patient T.T. (Claim No. 044579850) was diagnosed with alleged cervical radiculopathy by Northland on February 11, 2021, despite no physical examination that could have made this initial diagnosis, much less tests to confirm the same.

192.   T.T. had been evaluated by both her primary care physician and a separate pain management physician just two (2) weeks prior and had reported no injury or complaints to her neck at all.

193.   Northland used this unsupported and, at best, exaggerated diagnosis of radiculopathy (along with vague reports of pain in other body parts) to order nine (9) separate MRIs, all of which it billed several weeks later on March 4, 2021.

194.   Similarly, Northland diagnosed patient D.S. (Claim No. 045425213) with multiple radiculopathies based on nothing but the patient's vague reports of "tingling" in areas that it did not confirm correlated to any specific spinal level and did not perform any significant neurologic examination.

195.   Northland used this unsupported and exaggerated or fabricated diagnosis to create the appearance of support for ordering and billing for eight (8) separate MRIs on the same day.

196.   That the frequent evaluations billed by Northland were unnecessary at best, and often entirely fabricated, is evidenced by the fact that the purported examinations reported for these evaluations were copied and pasted between records over long periods of time, even when patients' conditions had materially changed.

197.   For example, Northland routinely used the same copied and pasted language to document purported "visible pain behavior . . . with use of single point

35

cane" for patient R.C. (Claim No. 043594967) at nearly every appointment over fifteen (15) months from September 2020 through at least December 2021.

198.   However, since at least January 2021, the patient had expressly reported to Northland that she no longer needed a cane to ambulate and did not actually present to the clinic with the cane referenced by the purported examination reports.

199.   There is no reason to believe that any of the defendants' copied and pasted records of purported examinations are any more reliable than this clear fabrication.

200.   Northland also continued to report diagnoses as though they were made at each evaluation – often including dozens of separate numbered purported conditions – long after patients had expressly reported that they no longer had any pain or complaints.

201.   These extensive lists of diagnoses that were often months or years removed from even any subjective complaints were used to create the impression that patients continued to complain of significant pain when in reality they had, at most, minor residual soreness that did not require any further regular monitoring by a physician.

202.   As one example of the defendants' full implementation of their predetermined treatment protocol, patient R.H. (Claim No. 045138759) purportedly

underwent an initial evaluation by Krpichak at Northland on March 29, 2021, just six (6) days after an alleged motor vehicle accident.

203. R.H. did not go to the emergency room at the time of the accident and continued to work following the accident.

204. Despite performing only a limited physical examination of R.H. and diagnosing only sprains and strains, Krpichak immediately ordered nine (9) MRIs for R.H. at the initial visit, which were billed by Northland that same day.

205. Northland also recommended immediate intramuscular injections of Toradol and vitamin B12 for R.H. for her "acute pain," which it also billed that same day, and prescribed several medications, including Zanaflex, Naproxyn, topical pain patches, and the opioid medication Tramadol.

206. Krpichak and Northland also ordered a urine drug screen for R.H., transportation assistance, household replacement services, and several items of DME, including a back brace and cane, billed by Northland, and a cervical pillow that was billed by Med Care.

207. Krpichak also ordered physical therapy for R.H., which defendant Great Lakes began billing for the next day and continued for a six (6) month period.

208. R.H. returned to Northland just four (4) days after her initial evaluation, on April 2, 2021, reporting that the Tramadol she had been prescribed was not

effective and was still experiencing pain despite none of the prescribed treatments having an opportunity to have an impact.

209.   At that time, Krpichak prescribed R.H. the opioid medication Norco, ordered additional urine drug testing, and also allegedly administered another injection of Toradol and vitamin B12 without assessing the effectiveness of the injection just four (4) days earlier.

210.   Northland continued to schedule R.H. for weekly follow-up Toradol injections, at which time it also repeatedly ordered both additional urine drug testing and additional injections, without ever evaluating the effectiveness of prior injections, including on April 7, April 14, April 21, April 28, and May 5, 2021.

211.   The bills submitted relative to R.H. were typical of all patients at issue herein, and reflect a concerted scheme through which patients were constantly pressured to undergo and referred for services, treatment, testing, and equipment that were extraordinarily excessive and unnecessary in order to generate massive amounts of charges to Liberty Mutual.

### B.   EXCESSIVE AND UNNECESSARY IMAGING

212.   The defendants subjected patients to excessive and unnecessary MRIs and CT scans in order to generate additional billing to Liberty Mutual.

213.   The MRIs and CT scans ordered by the defendants were ordered contrary to standards of care as part of the defendants' predetermined treatment protocol and not based on the individual needs and conditions of patients.

214.   As discussed in detail herein, the defendants violated the standards of care in numerous ways.

215.   On many occasions, defendant Northland ordered MRIs, CT scans, and other imaging at the initial evaluation of patients who had already undergone diagnostic studies just days or weeks earlier.

216.   For example, Northland billed for alleged MRI and magnetic resonance angiography ("MRA"), the latter of which was routinely used by Northland to unnecessarily multiply its bills, to patient J.S. (Claim No. 039510452) on April 29, 2019.

217.   Less than a month prior, and shortly after her alleged motor vehicle accident, J.S. had been admitted for several days to a hospital following a seizure-like episode where she underwent extensive brain testing and evaluation, including CT scans and MRIs.

218.   Northland was clearly aware of this significant and recent testing history, as it referenced the incident and the diagnoses made at the hospital in its review of J.S.'s history.

219.   Northland nevertheless billed more than $10,000 for this additional, redundant brain imaging solely to maximize the total amount that it billed to Liberty Mutual.

220.   The example of patient J.S. was not unique.  Northland was often aware of prior imaging, as its initial evaluation reports often acknowledged the existence of prior imaging and studies and the need to review those materials, but Northland physicians never actually did so and instead ordered duplicate imaging to generate additional billing.

221.   Northland physicians also frequently ordered repetitive and duplicative imaging with no clinical indication for such orders.

222.   Liberty Mutual is entitled to the return of money paid for Northland's medically unnecessary imaging ordered and billed pursuant to the defendants' predetermined treatment protocol.

### 1.     Medically Unnecessary and Improper MRIs

223.   The defendants' predetermined treatment protocol included excessive orders for MRIs because Northland operated its own MRI facility and it billed hundreds of thousands of dollars of charges to Liberty Mutual for imaging studies at absurd rates.

224.   The MRIs billed by Northland were used to generate charges for the defendants' scheme and were not used to guide patient care.

225.   As set forth below, the defendants' practice of ordering MRIs as a matter of course based on fabricated diagnoses and alleged subjective pain complaints violated standards of care for MRI testing and the bills submitted to Liberty Mutual as a result of such practice are fraudulent.

a.    **MRI Testing Ordered and Billed Contrary to Standard of Care**

226.   The defendants had a responsibility to ensure that MRIs were properly ordered and medically necessary, but they intentionally chose not to do so in order to maximize the amount of charges submitted to Liberty Mutual.

227.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

228.   Northland clearly acknowledges the relevance of the ACR and its guidelines and requirements to the field of radiology, as it sought and obtained accreditation from the ACR for its facility.

229.   MRIs should not be ordered based on vague, minor, and non-specific pain complaints, such as those routinely reported by the defendants, and are precisely the findings that the ACR guidelines are designed to remove from early resort to MRIs.

230.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

231.   For musculoskeletal joint MRIs, an orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

232.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

233.   The vast majority of patients with complaints of back pain do not require even x-rays, and imaging such as MRI is reserved for patients with progressive and severe neurologic deficits, and even with these patients, it is considered standard of care to first treat conservatively, and only order MRIs if these measures fail.

234.   The guidelines for brain MRIs provide that imaging is only appropriate for those patients with significant neurologic signs and symptoms indicative of concerning intracranial pathology.

235.   For patients with headaches after whiplash type injuries, or with mild head injuries, MRIs are not necessary and have been shown to not have any influence on the treatment or outcome of patients' complaints.

236.   The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

237.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

238.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistant pain following failure of conservative management only in select cases."

239.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

240.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

241.   Clinical practice guidelines advise at least six (6) weeks of conservative care before proceeding to MRI.

242.   MRIs should not be ordered in violation of the foregoing guidelines unless there is a clinical reason in the specific case and that reason must be documented in the patient's medical record.

243.   The defendants routinely ordered and billed for MRIs in violation of the foregoing guidelines and in violation of their responsibility to ensure that MRIs were properly ordered and medically necessary.

244.   One example of the defendants' failure to adhere to ACR guidelines involved patient T.T. (Claim No. 044579850) who allegedly had an initial evaluation at Northland on February 11, 2021, just two (2) weeks after a purported automobile accident.

245.   At that time, before T.T. had attempted any conservative treatment, Northland ordered, and subsequently billed for, nine (9) MRIs, which included MRIs of the bilateral shoulders even though T.T. did not report pain in her shoulders and Northland did not diagnose any type of shoulder injury.

246.   As another example of its failure to adhere to ACR guidelines when ordering MRIs, Northland ordered MRIs of the cervical spine, thoracic spine, lumbar spine, and left shoulder for patient K.S. (Claim No. 043532711) just nine (9) days after his alleged accident.

247.   Northland ordered the MRIs for K.S. prior to attempting physical therapy or other conservative treatment, and without making any neurologic findings to support ordering the MRIs.

248.   The defendants routinely ordered and billed for MRIs based only on patients' subjective pain complaints, without documenting any valid and sufficient clinical reason for the MRIs ordered as required by the ACR guidelines, and before attempting conservative treatment or when conservative treatment was effective.

**b.     MRIs Billed During Initial Stages of Treatment**

249.   MRIs at issue herein were routinely ordered and billed by Northland at the outset of the patient's treatment, and before allowing time for conservative treatment to be effective (or in many cases, even begin), thus evidencing that MRIs were ordered as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

250.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."   Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?  262 Radiology 941, 942 (2012).

251.    Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms." Id. at 945.

252.    At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

253.    Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

254.    Northland routinely ordered and then billed for MRIs of patients who had only just initiated treatment, often within the first thirty (30) days after the patients' alleged accidents.

255.    As discussed previously, for example, Northland ordered nine (9) MRIs for patient T.T. just two (2) weeks after her accident, and billed Liberty Mutual for performing those MRIs on March 4, 2021.

256.    Additional examples of Northland ordering and then billing for MRIs just days after patients' alleged accidents include the following:

a.    Northland billed for five (5) MRIs of patient A.C. (Claim No. 0418950890002) on December 4, 2019, just two (2) days after his purported accident, and then billed for two (2) additional MRIs just three (3) days later, on December 7, 2019.

b.    Northland billed for eight (8) MRIs of patient D.Z. (Claim No. 0446365250001) on February 1, 2021, just four (4) days after his purported accident.

c.    Northland billed for four (4) MRIs of patient A.L. (Claim No. 0389707390002) on January 16, 2019, just ten (10) days after her alleged accident.

d.    Northland billed for six (6) MRIs of patient C.D. (Claim No. 0481185470003) on January 17, 2022, just nine (9) days after her alleged accident.

e.    Northland billed for four (4) MRIs of patient D.W. (Claim No. 0381228910005) on September 4, 2018, just six (6) days after her purported accident.

f.    Northland billed for six (6) MRIs of patient J.G. (Claim No. 0470110120002) just 18 days after her alleged accident.

g.    Northland billed for five (5) MRIs of patient J.C. (Claim No. 0447867440001) just 11 days after his purported accident.

257.    It is not possible for patients for whom MRIs were performed just days or weeks after their alleged motor vehicle accidents to have attempted the conservative treatment required by the ACR guidelines before resorting to MRIs.

258.    The patients at issue herein for whom Northland billed for MRIs within the first days and weeks after their alleged motor vehicle accidents had non-emergent medical conditions that were often "diagnosed" as nothing more than pain, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging.

### c.   Excessive Numbers of MRI Scans

259.   In addition to billing for MRIs as soon as possible after an alleged accident in violation of standards of care, Northland also sought to maximize the amount of charges submitted to Liberty Mutual by ordering and billing for far more MRIs than were medically necessary.

260.   MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region.

261.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2019, which documents that just 12.32% (111,535 of 905,117) of all patients underwent MRIs of multiple body parts during the same visit, and only 3.4% (31,044 of 905,117) of all patients underwent MRIs of three (3) or more body parts during the same visit.

262.   Likewise, in 2020, the data reported to the State of Michigan by all MRI providers documents that just 12.27% (95,225 of 776,276) of all patients underwent MRIs of multiple body parts on the same visit, and only 2.9% (22,475 of 776,276) of all patients underwent MRIs of three (3) or more body parts during the same visit.

263.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

264.   By comparison, between January 4, 2018 and April 20, 2022, Northland billed Liberty Mutual for MRI visits on 150 separate dates of service for its patients, and it billed for two (2) or more MRIs during those visits 120 times, or on 80% of all MRI visits.

265.   Out of 96 different patients for whom Northland billed Liberty Mutual for performing MRIs between January 4, 2018 and April 20, 2022, 84 of those patients, or more that 87%, received two (2) or more MRIs on a single date of service for which MRIs were billed by Northland.

266.   Northland billed Liberty Mutual for four (4) or more MRIs on a single patient on a single date of service with respect to 64 of the 96 patients for whom it billed Liberty Mutual between January 4, 2018 and April 20, 2022, representing more than 66% of all such patients.

267.   Ten (10) patients for whom Northland billed Liberty Mutual during the same period allegedly received an incredible ten (10) or more MRIs on a single date of service, or more than 10% of all patients for whom Northland billed for MRIs.

268.   Further exemplifying the outrageous numbers of MRIs ordered and billed by Northland solely to generate additional billing, Northland billed Liberty Mutual for allegedly performing twenty-three (23) MRIs on patient D.H. (Claim No. 0390602830001) over a period of approximately two and a half years.

269.   One of the ways that Northland was able to bill for so many MRIs (for more than $4,000 for each purported scan) was to bill separately for scans that could and should have been performed together.

270.   For example, Northland billed for eight (8) separate MRIs to patient C.H. (Claim No. 045651558) between June 15, 2021 and June 17, 2021, including separate charges for alleged scans of the patient's right hand and right wrist.

271.   Assuming these scans were done at all and were actually done separately, there was no medical reason that Northland could not have increased the field for the scan and imaged the hand and wrist together.

272.   Of course, Northland did not do this for C.H. or for any other patient because its goal was to generate as many charges as possible.

273.   Similarly, Northland regularly billed for performing both MRIs and MRAs to patients' brains at the same time.

274.   An MRA is a very similar test to an MRI that increases focus on blood vessels in the brain, and which is completely unnecessary and unreasonable to bill as a matter of course at the same time as MRIs.

275.   Liberty Mutual is entitled to the return of money paid for Northland's medically unnecessary imaging ordered and billed pursuant to the defendants' predetermined treatment protocol.

### d.    Medically Unnecessary 3D Rendering

276.   In addition to billing for an incredible number of MRI scans, often at the initiation of treatment and without the examination findings or attempts at conservative treatment directed by the ACR, Northland also routinely billed Liberty Mutual for medically unnecessary 3D rendering of MRI images.

277.   According to ACR directives, 3D rendering "should be done at the request of or in consultation with the referring physician when there is a medical necessity."

278.   The ACR further advises that "[p]ractices that routinely provide 3D rendering may prompt an investigation by the Office of Inspector General."

279.   Wisconsin Physicians Service Insurance Corporation ("WPS") is the Medicare Administrative Contractor that processes bills submitted by providers in Michigan for patients eligible for Medicare coverage.

280.   WPS issued a Local Coverage Determination stating that "[i]t is incumbent upon the requesting physician to maintain documentation supporting the medical necessity of the additional work involved in the rendering, interpretation and report of the three-dimensional (3D) images."

281.   Northland submitted bills for 3D rendering that was not supported by the medical documentation and was therefore medically unnecessary.

282.   The Northland physicians who ordered the extensive MRIs billed to Liberty Mutual did not even attempt to document a need for 3D rendering of the imaging studies ordered as opposed to traditional MRI imaging.

283.   Billing for 3D rendering was yet another method used by Northland to add enormous charges to its already unnecessary and improper bills to maximize the total amount claimed from Liberty Mutual.

## 2.    Excessive and Medically Unnecessary CT Scans

284.   The defendants' predetermined treatment protocol also included excessive and medically unnecessary orders for CT scans, which were also ordered solely to generate additional bills by Northland.

285.   Northland routinely ordered multiple unnecessary CT scans for patients who were unable to undergo MRIs by applying the same treatment protocol it used to order MRIs discussed previously.

286.   Northland also ordered medically unnecessary CT scans in addition to the multiple, unnecessary MRIs it ordered.

287.   The CT scans billed by Northland were not medically justified and lacked objective indications supporting the orders.

288.   As with MRIs, the ACR defines the practice parameters and technical standards for conducting CT scans.

289.   According to the ACR, an order for a CT scan should "provide sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation."

290.   The ACR also promulgates specific "Appropriateness Criteria" for CT scans, as it does for MRIs as discussed above.

291.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that CT scans are "usually not appropriate" immediately following acute trauma, such as an auto accident, if one of the following "low-risk factors" is present: (1) the pain was the result of a simple rear-end motor vehicle crash, (2) the patient is able to sit "in sitting position," (3) the patient is ambulatory, (4) there was delayed onset of neck pain, or (5) there is an absence of midline cervical spine tenderness.

292.   As with the improper bills for MRIs at issue herein, the defendants' practice of ordering CT scans as a matter of course on patients with low risk factors based solely on alleged subjective pain complaints, whether in lieu of or in addition to ordering MRIs, violated standards of care for ordering and performing CT scans and the bills submitted to Liberty Mutual as a result of such practice are fraudulent.

293.   Vague, minor, and non-specific pain complaints such as those routinely reported by these defendants are precisely the findings that the ACR Appropriateness Criteria are designed to remove from early resort to CT scans.

294.   Nevertheless, Northland routinely ordered CT scans based only on patients' subject pain complaints, even when conservative treatment was effective and without documenting medical necessity for the CT scans ordered as required by the ACR Practice Parameters.

295.   Northland had a responsibility to ensure that CT scans it performed were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Liberty Mutual.

296.   As one example of the defendants' immediate resort to CT scans based on subjective complaints and in spite of the presence of low risk factors, Northland ordered seven (7) CT scans for patient C.A. (Claim No. 043319371) just four (4) days after his alleged motor vehicle accident.

297.   Northland ordered CT scans for C.A., instead of MRIs, because C.A. had a pacemaker that prevented him from receiving MRIs.

298.   As with its practice ordering numerous, immediate MRIs discussed previously, Northland failed to identify any clinical basis for ordering the CT scans immediately after C.A.'s accident and prior to attempting conservative treatment.

299.   Rather, the CT scans were ordered solely as a way to generate additional billing to Liberty Mutual for services that were medically unnecessary, excessive, and improper.

300.   Liberty Mutual is entitled to the return of money paid for Northland's medically unnecessary CT scans ordered pursuant to the defendants' predetermined treatment protocol.

### C.   EXCESSIVE AND UNNECESSARY URINE DRUG TESTING

301.   As part of the defendants' predetermined treatment protocol, defendant Northland routinely ordered urine drug testing ("UDT") to permit defendant Pioneer Lab to submit thousands of dollars of bills to Liberty Mutual for alleged drug testing performed on each specimen purportedly collected from the patients at issue herein, not for reasons of medical necessity.

302.   UDT was routinely ordered by Northland and billed by Pioneer Lab without regard to medical necessity and contrary to established standards of care.

303.   Pioneer Lab billed for performing both presumptive testing and for dozens of definitive drug tests of the same specimens on the same dates almost every time it billed Liberty Mutual, which was improper, and even when such testing was never specifically ordered or was contrary to what was ordered.

304.   Pursuant to this improper practice, Pioneer Lab billed Liberty Mutual for alleged presumptive UDT on 200 occasions from July 2019 through April 2022 using CPT code 80307 ("*presumptive drug testing through the use of instrument chemistry analyzers, including immunoassay, chromatography, and mass*

*spectrometry*") and also billed for extensive definitive UDT without regard to whether such testing was ordered or medically appropriate.

305.   Presumptive drug testing typically is utilized by a medical provider to rule out illicit drug use or to confirm the presence of a particular drug class without identifying individual drugs.

306.   Presumptive drug testing is properly used in the context of pain management treatment when it is random and designed to ascertain whether patients are abusing or diverting potentially dangerous medications.

307.   Guidelines for the proper use of urine drug testing performed in the context of a physician prescribing opioid medications to treat patients for chronic pain provide that testing may be appropriate to monitor for issues such as substance abuse disorder, medication adherence, diversion, efficacy, and side effects, and provide that in order to establish the medical necessity for such testing, specific elements must be established during a clinical assessment and documented in the patient's medical record including (1) patient history, physical examination, and previous laboratory findings, (2) the patient's current treatment plan, (3) a review of the prescribed medications, and (4) a risk assessment plan.

308.   A risk assessment plan must evaluate the patient's risk potential for abuse and diversion, document that assessment, and categorize the patient as low risk, moderate risk, or high risk.

309. The frequency of random testing for a given patient should depend on the provider's completed risk assessment of the patient.

310. The guidelines provide that random testing of low risk patients one (1) to two (2) times every twelve (12) months is appropriate, random testing of moderate risk patients one (1) to two (2) times every six (6) months is appropriate, and random testing of high risk patients one (1) to three (3) times every three (3) months is appropriate.

311. In addition to never identifying whether patients were at low, moderate, or high risk of abuse, the defendants ordered drug testing that was not random and far in excess of the testing recommended even for patients at the highest risk of abuse or misuse.

312. The defendants frequently ordered drug testing at every patient appointment, resulting in testing that far exceeded the standard of care.

313. As one example of this practice, Northland ordered UDT for patient R.H. (Claim No. 045138759), for whom it prescribed the opioid Norco, twenty-eight (28) times in a twelve (12) month period between March 29, 2021 and April 14, 2022.

314. Northland never performed a risk assessment for R.H., noted no particular concerns that she was abusing or diverting the medications she was prescribed, and even noted on at least one occasion, on October 4, 2021 when it

57

ordered additional urine drug testing, that the results of testing of a sample obtained just one (1) week earlier were "consistent with her medication use."

315.   The extreme amount of urine drug testing ordered for R.H. served no medical purpose and was intended solely to generate additional billing by Pioneer Lab, which billed Liberty Mutual $92,600 for alleged urine drug testing with respect to patient R.H. just in 2021.

316.   As another example, Pioneer Lab billed Liberty Mutual for drug testing for patient T.T. (Claim No. 044579850) ordered by Northland on thirteen (13) different dates of service over a period of less than seven (7) months.

317.   Northland never performed a risk assessment with respect to T.T., for whom it was prescribing Norco, but continued to order drug testing at every appointment.

318.   For example, even though Northland noted on its evaluation report for T.T. on April 6, 2021 that it had reviewed the results of her most recent drug testing, which had occurred just a few days earlier on March 26, 2021 and showed no unexpected results, Northland reported that "we will continue to review the toxicology screens for compliance" and ordered another round of drug testing that day.

319.   As yet another example of the defendants' inexplicable billing for urine drug testing, Northland billed for monthly purported evaluations of patient J.S.

(Claim No. 039510452) from April 2019 through at least October 2021, a period of more than two and a half years.

320.   On July 1, 2021, after more than two (2) years of repeated evaluations (all of which were falsely represented to be highly complex, as detailed below) during which there was never a concern about abuse or misuse of medications, Northland prescribed J.S. a medication called Trulicity to combat a claimed weight gain since her alleged accident.

321.   Trulicity is not a drug of abuse and is not a drug that is included on any of the predetermined testing panels ordered by Northland and billed by Pioneer Lab.

322.   Nevertheless, on July 1, 2021, and on three (3) additional dates over the next month (July 8, 2021, July 15, 2021, and August 5, 2021), Northland ordered and Pioneer Lab billed (more than $10,000) for extensive definitive urine drug testing that never sought to identify either the patient's use of Trulicity or the patient's use of drugs that could be misused or abused in combination with Trulicity.

323.   In other words, the extensive drug testing billed relative to J.S. served no conceivable medical purpose at all.

324.   Northland also ordered and Pioneer Lab billed for repeated drug testing to patient R.C. (Claim No. 043594967), who, like other patients, had comorbidities and a medical history that made the defendants' predetermined protocol completely inappropriate.

325. Specifically, R.C. had suffered a heart attack several months before she presented to defendant Northland and was placed on blood thinning medication by her cardiologist.

326. Due to the sensitivity of the blood thinning medication to drug interactions, R.C. could not undergo procedures or take new medications without the review and approval of her cardiologist.

327. Despite this precarious position that would have made drug misuse or abuse all but impossible, Northland administered its predetermined protocol of ordering urine drug testing at nearly every patient visit and Pioneer Lab billed for the same, totaling well over $10,000 on at least seven (7) separate dates of service over the course of just five (5) months.

328. In addition to ordering and billing for urine drug testing far more frequently than was medically appropriate, the defendants generated additional charges by billing for both presumptive and definitive drug testing of nearly every patient, even when there was no need for the definitive drug testing and even when that testing was not actually ordered.

329. Guidelines for drug testing provide that where randomized presumptive drug testing confirms an expected result, there generally is no need for further testing.

330.   Only when presumptive testing (i.e., screening) shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed, should confirmatory testing be performed.

331.   This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary.   Clinical correlation is appropriate . . . .   In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.   However, if the patient disputes the unexpected findings, a confirmatory test should be done."

332.   Thus, SAMHSA confirms that, at most, only unexpected initial presumptive testing results should be confirmed via further testing in the absence of a patient-specific decision otherwise from the treating provider.

333.   Contrary to these guidelines, Pioneer Lab billed for both presumptive and for performing dozens of definitive drug tests even when there were no unexpected results at all.

334.   In fact, Pioneer Lab billed for both presumptive testing and for definitive drug testing that was never actually ordered as a way to further inflate its billing.

335.   As demonstrated by the sample below, the order forms used by Pioneer Lab for its drug testing included boxes for ordering various presumptive testing and for ordering various classes of definitive drug tests, and also allowed the ordering physician to provide any point of care test results and to provide "additional instructions" to "confirm all positive presumptive test results" and "Cross Reference and Definitive Test Medication list for Unexpected Negatives."



| PRESUMPTIVE TESTING: Request Presumptive Lab Testing Ordered On The Following: | | | | | | | | Additional Instructions: | | |
|---|---|---|---|---|---|---|---|---|---|---|
| TEST DATE | | | | | | | | | | |
| Individual Order | Analyte | Individual Order | Analyte | Individual Order | Analyte | Individual Order | Analyte | Confirm all positive presumptive test results | | |
| | AMP | | BZO | | OPI | | THC | | | |
| | BAR | | COC | | OXY | | Specimen Validity | Cross Reference and Definitive Test Medication list for Unexpected Negatives | | |
| | BUP | | MTD | | PPX | | | Definitive Drug Testing by LCMS | | |

| Point of Care Test Results | | | | | | | CPT Defined Drug Class | Definitive Test | CPT Defined Drug Class | Definitive Test |
|---|---|---|---|---|---|---|---|---|---|---|
| | | POS | NEG | | POS | NEG | Alkaloids | | Methylphenidate | |
| Amphetamine (AMP) | | ☐ | ☐ | (MDMA) | ☐ | ☐ | Amphetamines | | Opiates | |
| Barbiturate (BAR) | | ☐ | ☐ | Methamphetamine (MET) | ☐ | ☐ | Barbiturates | | Opioids and opioid analogs | |
| Buprenorphine (BUP) | | ☐ | ☐ | Opiates (OPI) | ☐ | ☐ | Benzodiazepines | | Oxycodone | |
| Benzodiazepine (BZD) | | ☐ | ☐ | Oxycodone (OXY) | ☐ | ☐ | Buprenorphine | | Phencyclidine | |
| Cocaine (COC) | | ☐ | ☐ | Propoxyphene (PPX) | ☐ | ☐ | Cannabinoids, Natural | | Propoxyphene | |
| Methadone (MTD) | | ☐ | ☐ | Marijuana (THC) | ☐ | ☐ | Cocaine | | Sedative Hypnotics | |
| | | | | | | | Fentanyl | | Skeletal muscle relaxants | |
| | | | | | | | Heroin metabolite | | Stimulants, synthetic | |
| | | | | | | | Ketamine and Norketamine | | Tapentadol | |
| | | | | | | | Methadone and metabolite | | Tramadol | |
| | | | | | | | Methylenedioxyamphetamines | | | |

Please Read the Following Notice Concerning Medically Necessary and Reasonable Testing:
Only tests that are medically necessary and reasonable for the diagnosis or treatment of a patient, and individualized to that patient, will be reimbursed. Practitioners should consult with Local Coverage Determinations (Medicare) and Medical Policies (Commercial).
Any person who orders or influences the ordering of medically unnecessary or unreasonable tests for which reimbursement is claimed may be subject to action that includes, but is not limited to, civil penalties under the False Claims Act.
Note: Many payers have limitations on the number or frequency of tests that may be conducted. Please consult payer guidance on routine testing for more information.

Provider/Practitioner Order & Signature:

62

336.  In ordering drug testing from Pioneer Lab, Northland routinely failed to identify any specific presumptive or definitive drug testing that was to be performed, and instead simply checked the "additional instructions" boxes of the Pioneer Lab to "confirm all positive presumptive test results" and to "Cross Reference and Definitive Test" the patient's medication list, despite the fact that prescribed patient medications were not provided to Pioneer Lab by Northland.

337.  Yet despite the order form identifying no testing to be performed and Pioneer Lab being instructed to confirm only "positive" presumptive test results or "unexpected" negative results, Pioneer Lab routinely billed for allegedly performing a full panel of presumptive testing as well extensive definitive drug testing even when all of the presumptive drug testing was negative and there were no unexpected results.  In other words, Pioneer Lab billed for testing that was not prescribed.

338.  As one example of this practice, on April 19, 2021, Northland ordered drug testing by Pioneer Lab with respect to patient T.T. (Claim No. 044579850), for whom it was prescribing Norco, using the Pioneer Lab order form and checking only the "additional instructions" boxes without identifying any tests.

339.  Pioneer Lab billed Liberty Mutual $1,000 for alleged presumptive urine drug testing of the urine sample for T.T. on April 19, 2021 and, despite identifying no unexpected results or positive tests for substances not being prescribed by Northland, Pioneer Lab billed Liberty Mutual an additional $2,512.50 for allegedly

performing extensive definitive drug testing that was never ordered and that was entirely unnecessary.

340. That the drug testing ordered by Northland and billed by Pioneer Lab was unnecessary is also illustrated by the fact that Northland did not actually use the results of such testing to guide its prescriptions and treatment plans.

341. For example, patient D.S. (Claim No. 045425213), who has a criminal history that involves illegal distribution of opioids, had a urine screen that returned results inconsistent with his prescriptions on May 17, 2021.

342. Despite this finding, for which Liberty Mutual was billed over $1,000 to test, Northland billed for dispensing the opioid medication Norco to D.S. on the same date.

343. When D.S. was later asked by a different Northland physician, he admitted to recreational use of methamphetamine and cocaine and was given Belbuca instead, which is also an opioid that is delivered via sublingual film.

344. Further, despite readily admitting to illicit drug use, Northland nevertheless claims to have collected a urine specimen and both Northland and Pioneer Lab billed thousands of dollars ostensibly to uncover evidence of the drug use to which D.S. had already admitted.

345.   Patient T.T. (Claim No. 044579850), who was prescribed hydrocodone by Northland, had drug tests that failed to detect the presence of that opioid medication on March 12, 2021 and March 26, 2021.

346.   Northland nevertheless continued to prescribe the medication and made no comment about these repeated failed drug tests.

347.   Liberty Mutual reasonably relied on Pioneer Lab's bills to contain truthful and accurate representations regarding the urine drug testing allegedly prescribed and performed, and the necessity of the same.

348.   Tests that were not actually ordered and have no bearing on patient treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

### D.   EXCESSIVE AND UNNECESSARY INJECTIONS AND PROCEDURES

349.   The performance of invasive procedures, including injections, must be based upon adequate diagnosis and legitimate medical necessity.

350.   As discussed above, examinations billed by the defendants, if they were performed at all, resulted only in vague, boilerplate findings and predetermined treatment plans that were not adequate to support the performance of invasive procedures.

351.   Despite this, Northland routinely made internal referrals of patients to its "pain management" physicians, including Jay R. Joshi, M.D. ("Joshi"), who

recommended extensive series of back and joint injections and related procedures that were not medically indicated or appropriate.

352.  Northland frequently repeated injections or performed additional injections without properly assessing the effectiveness of prior injections or information gleaned from previous injections, in derogation of standards of care.

353.  Northland persisted in recommending that patients undergo additional rounds of injections whether or not prior injections were beneficial in order to generate bills to Liberty Mutual.

354.  Consequently, patients received unjustified invasive procedures that offered little therapeutic or diagnostic efficacy while subjecting the patients to unnecessary risks of infection and the risks associated with anesthesia.

355.  Northland billed for alleged injections to patients at issue in this Complaint without regard for conservative forms of treatment.

356.  Even in those instances where patients reported improvement from conservative treatment, Northland nonetheless pushed for more injections to be administered.

357.  Northland also frequently, and improperly, pressured patients to undergo, and billed for performing, repeated injection procedures even when prior injections resulted in no documented benefit, or based on moderate, short-term

benefits that were incorrectly interpreted as successful procedures in order to justify repetitive interventions.

### 1. **Medically Unnecessary and Improper Toradol Injections**

358.   Northland frequently ordered and billed for intramuscular Toradol and vitamin B12 injections, often beginning at patients' initial visits and continuing at numerous follow up visits.

359.   Toradol injections are properly used only as a short-term treatment of moderately severe acute back or neck pain, and are only intended to provide relief for a few hours.

360.   Toradol injections should not be used for longer than five (5) days, for mild pain, or for pain from chronic conditions, as their use may have serious side effects, the risk of which increases with the length of use.

361.   Contrary to these guidelines, Northland frequently billed for administering repeated Toradol injections to patients, often on a weekly basis for up to several months at a time.

362.   As one example of this improper practice, Krpichak recommended a Toradol injection to patient R.H. (Claim No. 045138759) at her initial evaluation at Northland on March 29, 2021, and billed for allegedly administering the injection that day.

67

363.   Without ever evaluating whether the Toradol injection was beneficial or effective, Northland continued to bill for additional Toradol injections to R.H. for a period of more than seven (7) months, including on April 2, 2021, just four (4) days after the initial injection, and again on April 7, April 21, April 28, May 5, June 1, July 1, September 3, and October 18, 2021.

364.   That Northland's alleged Toradol injections were done as a matter of course to generate charges is also evidenced by the fact that they often were billed without reporting any specific diagnosis and without documenting what area of the patient's body was even injected.

365.   Often, Northland reported that Toradol injections were done in response to "spasm," even though spasms had not been noted during patient examinations.

366.   Moreover, patients were often claimed by Northland to have as many as two dozen separate, vague diagnoses to different body parts (to support the excessive treatment billed pursuant to its predetermined protocol), making it impossible for Liberty Mutual (or other treating physicians) to discern, what, if anything, was actually injected.

367.   Liberty Mutual is not required to pay for injections that were non-specific, not based on actual examination findings, and done only to increase and multiply the amount of No-Fault claims submitted.

## 2.   Medically Unnecessary and Improper Medial Branch Block Injections

368.   Medial branch block injections, also referred to as facet block injections, are indicated when a patient complains primarily of axial, non-radiating spinal pain and involve injecting anesthetic near medial branch nerves that feed out from facet joints.

369.   Medial branch block injections are intended to be diagnostic, in that if a patient experiences a sufficient level of short-term pain relief for an appropriate period of time then the facet joint is determined to be the possible source of the patient's pain, indicating the patient is a candidate for other therapeutic treatments such as radiofrequency ablation or rhizotomy.

370.   There is rarely a medical reason to repeat facet injections, as the diagnostic information of whether a patient experienced pain relief through such treatment is gleaned from the first procedure.

371.   Northland nevertheless routinely billed for repeated facet injections, which it often called "confirmatory," which evidences its awareness that the diagnostic information had already been obtained.

372.   For example, on September 27, 2021, Northland reported that prior facet injections to patient C.H. (Claim No. 045651558) resulted in 100% relief of her pain for a period of three (3) days, which is considered a successful facet

injection and which provided the intended diagnostic information that the patient may benefit from a more permanent treatment targeting the same area.

373. Northland nevertheless billed for a second round of "confirmatory" facet injections because it gave it the opportunity to bill Liberty Mutual thousands more dollars relative to this patient.

374. Northland also billed for facet injections that could not have been used for their intended diagnostic purpose, including because in its effort to bill as much as possible, Northland billed for other procedures to the same area of patients' bodies that necessarily confounded any information gleaned from the injections.

375. For example, Northland billed for alleged multi-level facet injections to patient J.S.'s (Claim No. 039510452) lumbar spine and sacrum on October 28, 2021, but on the same date also billed for the alleged performance of a sacroiliac injection.

376. If J.S. obtained any relief from the injections, which was not recorded by Northland, she would not have been able to discern whether such relief was from the facet injections or from the sacroiliac injection, and Northland could not have used any report of pain relief to develop a further plan of care.

377. This practice of billing for multiple types of injections at the same time was repeatedly used by the defendants as their goal was to bill as much as possible,

not to follow appropriate medical practice to find treatments that would end patients'
complaints.

378.   Northland also billed for facet injections for patients for whom they
could have served no purpose.

379.   For example, patient R.H. (Claim No. 045138759) had a history of a
cervical fusion of her C4 through C7 vertebral levels, which means that her facet
joints were immobilized at those levels and would not have been pain generators,
and which Northland indisputably knew because it billed for an MRI of R.H.'s
cervical spine that confirmed these levels were fused.

380.   Northland nevertheless billed for three-level facet injections to R.H. on
March 15, 2022 from the C3 to C6 vertebral levels, two (2) of which were fused.

381.   Northland also routinely billed for facet injections that it expressly
claimed were intended to be diagnostic (which is the proper use), but then failed to
make any assessment about how the injections impacted the patient, including a
separate set of facet injections to patient R.H.'s lumbar spine and sacrum billed on
February 15, 2022.

382.   Northland's misuse of facet injections resulted in an extraordinary
amount of billing for improper and unnecessary services.

383.   For example, Northland billed more than $300,000 for purported
treatment to patient D.H. (Claim No. 039060283), which was driven primarily by

redundant, excessive, and medically unnecessary facet injections that were billed on seven (7) separate dates, always three (3) levels at a time, and often to the same exact vertebral levels.

384.   Similarly, Northland billed more than $400,000 for purported treatment to patient N.A. (Claim No. 031321201), which was also driven by redundant, excessive, and medically unnecessary facet injections that were billed on seven (7) separate dates, always three (3) levels at a time, and often to the same exact vertebral levels.

385.   All bills for injections that were unnecessary and served no medical purpose were fraudulent and Liberty Mutual is entitled to repayment of all amounts it was induced to pay as a result of the defendants' bills and records that (mis)represented otherwise.

### 3.   Medically Unnecessary Use of Anesthesia with Injections

386.   In addition to billing for injections that were not medically appropriate for the reasons discussed above, the defendants multiplied the amounts charged to Liberty Mutual and increased the danger of complications to their patients by performing routine pain management injections under anesthesia.

387.   The ESI, facet injections, paravertebral block, and trigger point injections commonly billed by the defendants are simple injections that are performed in just minutes and can and should be performed with only a local

anesthetic absent unique circumstances that are documented in a patient's medical record.

388.   For example, government guidelines instruct that general anesthesia is considered not medically reasonable and not necessary for facet joint interventions, and "neither conscious sedation nor Monitored Anesthesia Care ("MAC") is routinely necessary for intraarticular facet joint injections or medial branch blocks and are not routinely considered medically reasonable and necessary."

389.   Likewise, guidelines with respect to the use of ESI for pain management state that the use of moderate or deep sedation, general anesthesia, or MAC is "usually unnecessary [and] rarely indicated for these procedures and therefore, is not considered medically reasonable and necessary."

390.   Similarly, according to the American Society of Anesthesiologists ("ASA"),[3] "the majority of minor pain procedures do not require anesthesia care other than local anesthesia.  Such procedures include epidural steroid injections, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections."

---

[3] The ASA is an educational, research, and scientific association of physicians organized to raise the standards of the medical practice of anesthesiology and to improve patient care.

391.   The ASA further states that "[t]he use of general anesthesia for routine pain procedures is warranted only in unusual circumstances," which rarely present themselves.

392.   Contrary to these guidelines, defendant Northland routinely billed for anesthesia for patients receiving routine injections, but never documented any reasons the use of anesthesia was necessary.

393.   Subjecting patients to anesthesia for routine injections, without any medical basis, resulted in patients taking unnecessary risks of infection, airway obstruction, and other risks associated with anesthesia, all in order to permit the defendants to increase their bills to Liberty Mutual.

394.   The ASA has expressly warned that unnecessary use of anesthesia for routine injections is a risky practice that is a major factor in the occurrence of inadvertent neural injury.   Rendering patients unconscious during an ESI is especially risky because the patient cannot communicate nerve pain to the injecting physician if the needle is placed in a location that might cause neural injury.

395.   That the defendants' billing for anesthesia in connection with routine injections was medically unnecessary is further evidenced by the inconsistency with which they billed.

396.   For example, Northland billed for alleged trigger point injections to patient R.H. (Claim No. 045138759) on July 15, 2021 without the use of anesthesia,

but when the same procedure was allegedly repeated on R.H. to the same spinal levels on October 28, 2021, a separate charge for medically unnecessary sedation was added.

397.   Billing for anesthesia for trigger point injections, which are particularly routine and minimally invasive is so out of the ordinary that Northland's own records for the October 28, 2021 procedure stated that no anesthesia at all was used (including local anesthesia).

398.   Northland was also wildly inconsistent in the type of anesthesia billed for routine pain management injections, in some cases claiming to have used a cocktail of propofol, ketamine, fentanyl, and other drugs, and in other same or similar procedures claiming to have used as little as two (2) milligrams of a medication called Versed.

399.   As detailed below, Northland always fraudulently unbundled charges for the individual substances allegedly injected and charged thousands of times their cost, making its motivation for these unnecessary services clear.

400.   All of the charges submitted to Liberty Mutual by Northland and Gandhi for injections and for the use of anesthesia in conjunction with injections that were not medically necessary are not compensable.

## E.    MEDICALLY UNNECESSARY SURGICAL PROCEDURES

401.   As discussed above, defendants Northland and Gandhi worked with defendants Crawford and Crawford P.C. to pressure patients to undergo surgical procedures to further inflate the amounts billed to Liberty Mutual.

402.   Patients were referred to Crawford and Crawford P.C. because the defendants knew that they would be aggressively recommended to undergo surgical procedures regardless of necessity and whether conservative options had been adequately attempted.

403.   Crawford and Crawford P.C. made these aggressive surgical recommendations without ordering or performing thorough testing, and often without reviewing testing that was readily available.

404.   For example, Crawford and Crawford P.C. recommended that patient R.C. (Claim No. 043594967) undergo a fusion of her wrist at her first evaluation based only on x-rays that were allegedly taken that day.

405.   However, Northland had previously billed for multiple MRIs, including separate charges (four (4) in total) for R.C.'s bilateral hands and wrists, none of which were reviewed before Crawford and Crawford P.C.'s surgical recommendation and all of which had returned findings of, at most, mild degeneration.

406.   Patient R.H. (Claim No. 045138759) presented to Crawford on April 13, 2021, which was less than a month after an alleged accident and just two (2) weeks after R.H. began an extensive course of physical therapy and chiropractic treatment at defendants Great Lakes and Live Well.

407.   At that initial evaluation, and without assessing the efficacy of physical therapy or attempting any other conservative treatments, Crawford immediately recommended surgery, which was billed by Crawford P.C. less than two (2) weeks later on April 26, 2021.

408.   Further, although Crawford referred in his records to performing an arthroscopic surgery, he inexplicably claimed in his operative report to not have attempted to repair R.H.'s rotator cuff arthroscopically but rather through an open incision, which was a practice also repeated with nearly every patient for whom he billed for shoulder surgery and which resulted in bills using more complex open-incision coding (which was also fraudulently unbundled, as detailed below).

409.   Crawford and Crawford P.C. also regularly billed for manipulations under anesthesia ("MUA"), which are considered experimental, investigational, and unproven for use on most areas of the body.

410.   MUA is generally considered reasonable for treatment of the following conditions only: arthrofibrosis of the knee; arthrofibrosis of the elbow; reduction of

a displaced fracture; reduction of an acute dislocation; and adhesive capsulitis (i.e., frozen shoulder).

411.  Crawford and Crawford P.C. never billed Liberty Mutual for the performance of MUA in ways that are accepted by the medical community.

412.  Instead, MUA was billed for without regard for whether patients had been diagnosed with a condition for which MUA is potentially effective, or whether conservative treatment had been employed and/or been utilized for a sufficient amount of time to determine if it would relieve the patient's symptoms.

413.  Injections, which are a more conservative and generally accepted treatment, should always be performed prior to resorting to MUA.

414.  Rather than perform injections and evaluate the patient's reaction before determining whether to proceed with a more invasive treatment, Crawford and Crawford P.C. regularly billed for injections at the same time as MUA such that the results of the injections could not have been used to inform the treatment plan.

415.  Moreover, the defendants never documented that patients for whom they billed Liberty Mutual for purported MUA had fear or nervousness that would limit the usefulness of manipulation without anesthesia.

416.  In fact, the defendants never attempted to perform manipulation without anesthesia before resorting to MUA.

417.   For example, Crawford and Crawford P.C. billed for MUAs to patient R.H. (Claim No. 045138759) on June 14, 2021 and January 21, 2022, and on both occasions failed to attempt more conservative treatments beforehand and failed to identify any diagnoses for which MUA could be considered a medically reasonable procedure.

418.   In addition to aggressively pressuring patients to immediately undergo surgery, Crawford and Crawford P.C. fraudulently unbundled nearly all of their bills for alleged procedures as discussed in further detail below.

### F.   EXCESSIVE AND UNNECESSARY PHYSICAL THERAPY AND CHIROPRACTIC

419.   As part of their predetermined treatment protocol, the defendants utilized Northland to automatically prescribe physical therapy for nearly every patient at nearly every appointment.

420.   As set out above, every patient who was sent to defendant Great Lakes for physical therapy was likewise referred to defendant Live Well for purported chiropractic treatment.

421.   Live Well typically billed for chiropractic manipulation on the same dates of service and at the same location that Great Lakes billed for alleged physical therapy modalities, and though the bills were split between providers, they consisted of one course of treatment.

422.   As discussed in further detail below, Great Lakes and Live Well split the chiropractic manipulation bills from the physical therapy modalities because several of the modalities regularly billed by Great Lakes, including manual therapy and massage therapy, are not permitted to be billed by the same provider on the same date of service.

423.   The physical therapy and chiropractic services prescribed and billed by the defendants was not designed or intended to treat patients' actual injuries, but rather was used as yet another means to generate additional billing.

424.   The automatic prescription of physical therapy was designed to, and did in fact, financially benefit the other defendants, since defendant Great Lakes billed for much of the purported physical therapy prescribed by Northland.

425.   Valid orders for physical therapy treatment require the services be objectively indicated and cannot be based on a patient's subjective complaints of pain alone.

426.   Physical therapy that is ordered for every patient automatically, instead of based on objective indications specific to the particular patient, is not medically necessary.

427.   In addition to ordering physical therapy for almost every patient, the defendants ordered excessive amounts of physical therapy and continued to do so even when the patients received no benefit from the physical therapy.

428.   Patients rarely should undergo physical therapy for more than four (4) to six (6) weeks, as after such time the physical therapy will have reached its maximum benefit and the patient should either cease in-office physical therapy or be recommended for a different type of treatment.

429.   When a patient is no longer making objective progress in physical therapy, the treatment plan must be changed or the patient discharged.

430.   Contrary to these guidelines, the defendants routinely ordered, and Great Lakes billed Liberty Mutual for, physical therapy that often continued for many months without ever substantially altering patients' treatment.

431.   That the ongoing physical therapy ordered by Northland and billed by Great Lakes was designed to financially benefit the defendants and was not designed or intended to treat any actual injury also is demonstrated by the fact that physicians at Northland did not evaluate the efficacy of the physical therapy beyond formulaic statements in their reports.

432.   These courses of therapy – which included excessive charges for purported one-on-one treatments that were not actually done, as detailed above – were maintained even when patients expressly reported that they had no benefit.

433.   For example, Great Lakes and Live Well each billed for extensive simultaneous courses of treatment to patient R.H. (Claim No. 045138759) beginning in March 2021 and continuing through at least October 2021.

434.   R.H.'s pain scores did not materially change throughout this extensive course of treatment, and were reported to be in the same range of 7-8 out of 10 in October 2021 as they were at the start of her purported treatment in March 2021.

435.   Further, R.H. expressly reported to other physicians, including to defendant Crawford on June 10, 2021, that physical therapy was not helping.

436.   Great Lakes and Live Well nevertheless continued billing for their extensive courses of treatment and did not make any changes to their predetermined protocol of modalities to address the fact that they were not helping R.H.

437.   Liberty Mutual is not required to pay the defendants for treatment based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

### G.   MEDICALLY UNNECESSARY AND IMPROPER DRUG PRESCRIPTIONS

438.   As part of their predetermined treatment protocol, Northland physicians routinely prescribed numerous medications beginning at patients' initial appointments, and continued providing frequent refills of those prescriptions at follow-up appointments.

439.   Patients were generally prescribed a similar collection of medications, such as Motrin and Robaxin, as well as topical pain creams, lidocaine patches, and multi-vitamins.

440.   The defendants also frequently prescribed patients opioid medications such as Norco.

441.   The medications prescribed by defendant Northland were not medically indicated by patients' conditions or by the evaluations performed by Northland.

442.   Indeed, patients at issue herein were prescribed medications pursuant to Northland's predetermined protocol that were clearly contraindicated and dangerous to patients.

443.   For example, patient J.C. (Claim No. 040829664) was placed in Northland's typical predetermined protocol despite having extensive and unique comorbidities, including heart disease, prostate cancer, polycystic kidney disease, and a history of a total knee replacement.

444.   As part of that predetermined protocol, J.C. was prescribed Motrin (ibuprofen), a non-steroidal anti-inflammatory medication that is contraindicated in patients with kidney disease.

445.   Northland did not evaluate the effectiveness of the medications they prescribed, but rather made the initial prescriptions and refills solely to generate additional billing.

446.   That these medications were prescribed and billed solely to generate additional billing is demonstrated by the fact that they were often refilled (again

without evaluating efficacy) long before a patient would or should have run out of a previous supply.

447.   For example, on November 18, 2021, Northland prescribed and MBMG billed nearly $2,000 for a 30-day supply of Zylotrol patches dispensed to patient C.H. (Claim No. 045651558) despite having billed nearly $2,000 for the previous 30-day supply on October 27, 2021, just three (3) weeks prior.

448.   Many of the medications prescribed by Northland and billed by the defendants, including MBMG, had no conceivable use in relation to a patient with purported injuries from a motor vehicle accident.

449.   For example, MBMG regularly billed nearly $300 for prescriptions for an over-the-counter "medication" called Immunicare, which can be obtained at retail stores for approximately $20 and is nothing more than a blend of Vitamin C and spices.

450.   Dendracin lotion was also routinely prescribed and billed for more than $1,000 in connection with nearly every appointment, despite Northland not discussing with patients whether the medication was beneficial or whether it was being used at all.

451.   Dendracin is a compound consisting of substances available over the counter and has never been proven to be effective for treatment of the types of pain diagnoses made by Northland physicians.

452.   Northland never documented a medical reason for why this expensive lotion was required as opposed to less expensive over-the-counter topical treatments.

453.   Northland also routinely prescribed Dendracin lotion to patients who had been diagnosed with spinal injuries or supposed internal derangements that could not possibly have been expected to be relieved by a topical lotion.

454.   Further, Dendracin lotion was routinely prescribed at the same time as topical patches that were directed to be worn for twelve (12) hours at a time on the same body parts, making it impossible that patients could have actually applied the lotion to their skin.

455.   Liberty Mutual has no obligation to pay for medications that are prescribed as a matter of course, are not needed or used by patients, and that are medically unnecessary.

## H.   MEDICALLY UNNECESSARY AND IMPROPER DURABLE MEDICAL EQUIPMENT

456.   Another aspect of the defendants' predetermined treatment protocol was automatic prescriptions for DME without regard to medically necessity and whether or not such DME was medically indicated.

457.   DME should only be prescribed based upon a valid diagnosis of specific impairment requiring the use of the particular item of DME.

458.   Contrary to this standard, the defendants routinely issued numerous items of DME to patients based on nothing more than the patient's pain complaints, and even when such DME was not medically indicated and was possibly counterproductive.

459.   For example, Northland routinely prescribed DME such as lumbar braces, knee braces, and cervical pillows without diagnosing any specific impairment requiring the use of such DME.

460.   Northland ordered this DME solely to increase the amount billed to Liberty Mutual for each patient, as it directly billed Liberty Mutual exorbitant amounts for issuing DME such as back braces to patients, and its co-defendant Med Care billed for other items of DME such as cervical pillows.

461.   As one example of this practice, patient J.S. (Claim No. 039510452) was allegedly involved in a motor vehicle accident on March 21, 2019, after which she was seen at Northland for the first time on April 29, 2019.

462.   Northland's report for its initial evaluation of J.S. indicates that she was wearing a left knee brace and back brace at the time of her initial evaluation on April 29, 2019.

463.   Despite already having both a knee brace and back brace, following numerous follow-up appointments, on July 30, 2019, Northland recommended and allegedly issued a knee brace and a lumbar brace to J.S. without identifying any

reason these new DME items were necessary and without identifying any impairment to J.S. that would require the use of braces at all.

464.   There was no medical necessity for either the lumbar brace or knee brace issued to J.S., and these items were ordered solely to generate additional billing by Northland, which billed Liberty Mutual $2,200 for the lumbar brace, which could have been purchased retail for approximately $200 or less, and $1,000 for the knee brace, which had a retail price of less than $100.

465.   Defendants Crawford and Crawford P.C. also regularly billed for unnecessary and improper DME allegedly issued to patients at issue herein.

466.   For example, Crawford P.C. billed for allegedly issuing a wrist splint to patient R.C. (Claim No. 043594967) on January 19, 2021 after R.C. was referred to him by Northland.

467.   However, Northland repeatedly documented that R.C. already had a wrist splint and that she presented to multiple prior visits wearing the same, making the additional DME billed by Crawford P.C. redundant and medically unnecessary.

## IX.   <u>FRAUDULENT BILLING PRACTICES</u>

468.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

469.   The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges to Liberty Mutual for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

470.   All of the medical records, bills, and invoices submitted to Liberty Mutual by the defendants contained CPT codes.

471.   By utilizing CPT codes to submit billing to Liberty Mutual, the defendants represented that the services they billed for corresponded to and were accurately described by the definitions for the CPT codes they utilized.

472.   The defendants intended that Liberty Mutual interpret the bills they submitted using the definitions ascribed to and guidelines applicable to the CPT and other billing codes that the defendants chose to use.

473.   The defendants never communicated to Liberty Mutual that they did not intend for their bills to be interpreted using anything other than the published meanings ascribed to and guidelines applicable to the CPT and other billing codes that they chose to use.

474.   Liberty Mutual reasonably relied on the defendants' utilization of CPT codes to accurately report the services they rendered to Liberty Mutual insureds.

475.   The vast majority of the bills submitted to Liberty Mutual by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by

the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

476.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

477.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Liberty Mutual through interstate wires and the U.S. Mail.

478.   The defendants also used the following fraudulent billing practices to further inflate charges to Liberty Mutual.

### A.   FRAUDULENT UPCODING

479.   As discussed above, the defendants made misrepresentations to Liberty Mutual by submitting documentation that included CPT codes for medical services that (1) were not actually performed, (2) were unlicensed and unlawful, (3) were not performed consistent with established standards of care, and (4) were wholly unwarranted and unnecessary.

480.   The billing codes submitted to Liberty Mutual by Northland and Crawford P.C. also consistently exaggerated the complexity of evaluations purportedly rendered in order to inflate the charges submitted to Liberty Mutual.

481.  Physician examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity involved in the examination.

482.  There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

483.  Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920"; reexaminations are billed using a CPT code that starts with the numbers "9921"; and consultations are billed using a CPT code that starts with the numbers "9924."

484.  The final number to complete each five-digit CPT code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

485.  To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

486.  To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history,

performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

487.   The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

488.   Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 reexaminations typically involve 25 minutes of face-to-face time.

489.   To warrant a medical bill demanding payment for a level 4 examination, the injury/condition necessarily requires: moderate risk of mortality, morbidity and/or complications; moderate diagnoses and review of complex data; and requires the medical provider to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

490.   The amount billed for an evaluation will vary depending on the complexity of the evaluation performed, with a higher amount charged for a higher complexity evaluation than for a low complexity evaluation.

491.   Since January 1, 2017, the vast majority of patient examination charges that Northland billed to Liberty Mutual were for level 4 and level 5 examinations. *See* Exhibit 1.

91

492.   Northland's examinations consistently fell far short of meeting the threshold standard to bill for level 4 and level 5 encounters.

493.   Northland failed to satisfy the time component for the charge submitted. It did not obtain comprehensive patient histories or perform detailed physical examination and its use of boilerplate language in reports and a predetermined treatment protocol for virtually every patient does not reflect the decision making of moderate complexity required to bill for level 4 and 5 examinations.

494.   As detailed above, Northland often copied and pasted large portions of its reports of purported evaluations, including alleged physical examinations, between examinations for months on end, further confirming that evaluations were not complex and that some or all of the components were not performed at all.

495.   Many of the appointments for which Northland represented it performed high level and complex patient encounters were self-characterized as nothing more than "medication checks" at which no examination or patient history was performed at all.

496.   The purported examinations billed by Crawford P.C. were even more cursory and do not remotely support the level of complexity billed.

497.   Many of Crawford and Crawford P.C.'s purported evaluations resulted in records that were less than two (2) lines long, did not record any patient history

or examination, and did not involve any medical decision-making, much less decision-making that could be considered complex.

498.   The defendants engaged in this improper and fraudulent upcoding in order to increase the amount they were able to bill to Liberty Mutual for patient appointments.

499.   By creating medical bills that included CPT codes for office visits and then causing such bills to be faxed and mailed to Liberty Mutual, defendants Northland, Gandhi, Crawford, and Crawford P.C. represented to Liberty Mutual that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

500.   However, the bills prepared, faxed, and mailed by these defendants were submitted using fraudulent and deceptive examination CPT codes representing patient encounters that did not actually occur as billed.

### B.   FRAUDULENT UNBUNDLING

501.   The defendants routinely unbundled services billed to Liberty Mutual, which resulted in tens of thousands of dollars in fraudulent bills.

### 1.   Northland's Fraudulent Unbundling

502.   Defendant Northland routinely and improperly unbundled charges to Liberty Mutual associated with injections and other alleged procedures.

503.   One frequent method of fraudulent unbundling used by the defendants was to bill for the alleged use of fluoroscopic guidance during injections when such guidance is expressly included in the charge for the injection itself.

504.   For example, Northland routinely included a separate charge for fluoroscopic guidance with its bills to Liberty Mutual for purported cervical and lumbar facet block injections.

505.   Northland submitted numerous bills for payment to Liberty Mutual for facet block injections using CPT codes 64490 through 64495, and also included a separate charge for fluoroscopic guidance using CPT code 77002 or 77003, even though the definitions for the injection codes billed each expressly state that they include fluoroscopic guidance.

506.   On each occasion, Northland included a separate charge of $1,000 to $1,200 for fluoroscopic guidance that was improperly unbundled from the billing for the injection itself.

507.   Similarly, Northland unbundled charges for guidance for epidural steroid injections it billed to Liberty Mutual.

508.   Northland did this by submitting bills for ESI using CPT code 62320, which is a billing code for epidural steroid injections performed without imaging guidance, and then including a separate charge for fluoroscopic guidance using CPT

code 77003, even though the AMA codes establish a separate CPT code for epidural steroid injections performed with imaging guidance: CPT Code 62321.

509.   Northland intentionally billed for ESI using the improper CPT code and then added a separate charge for imaging guidance because it allowed it to bill more for the alleged service.

510.   Since January 18, 2017, Northland has submitted to Liberty Mutual at least 158 bills that include separate charges for fluoroscopic guidance for a total amount of at least $178,200.  *See* Exhibit 1.

511.   Charges for fluoroscopic guidance that are unbundled from the underlying procedure are fraudulent.

512.   Liberty Mutual is not obligated to pay bills for fraudulently unbundled charges for fluoroscopic guidance and is entitled to recover all amounts paid to the defendants for such improper charges.

513.   Northland further fraudulently multiplied its charges for alleged injections by billing separately for local anesthetic claimed to have been used during the procedures.

514.   Anesthetizing a patient for an invasive procedure is considered a necessary component of such invasive procedure and the charge for doing so is included in the bill for the procedure itself.

515.   Northland has billed Liberty Mutual at least $502,124 for local anesthetic allegedly used in conjunction with pain management procedures, none of which was separately billable at all.  *See* Exhibit 1.

516.   Northland similarly fraudulently unbundled its charges for the medically unnecessary purported sedation and monitored anesthesia care allegedly used for routine pain management injections and other procedures.

517.   Billing for these types of anesthesia includes all associated services, including the pre- and post-procedure evaluations and the supplies used.

518.   Northland fraudulently unbundled charges for the substances allegedly injected and infused during anesthesia care, and often the amount improperly billed for these substances far exceeded the amount billed for the anesthesia itself.

### 2.     **Fraudulent Unbundling for Urine Drug Testing**

519.   In addition to billing for urine drug testing not performed and for excessive and medically unnecessary testing, as detailed *supra*, Pioneer Lab also fraudulently unbundled its charges for such purported testing to extract further payments to which it was not entitled from Liberty Mutual.

520.   One method used by Pioneer Lab to unbundle its drug test charges was to bill separately for specimen validity testing, including testing urine specimens for their pH and creatinine levels.

521.   Specimen validity testing is considered a quality control measure for urine drug testing that is a component of the testing itself, and therefore it is not to be separately billed.

522.   Moreover, when Pioneer Lab billed for urine drug testing using G0483, which was always for services not rendered as explained above, it violated the express definition of the code by billing separately for specimen validity testing as HCPCS code G0483 is defined as "Drug test(s), definitive, utilizing (1) drug identification methods able to identify individual drugs and distinguish between structural isomers (but not necessarily stereoisomers), including, but not limited to gc/ms (any type, single or tandem) and lc/ms (any type, single or tandem and excluding immunoassays (e.g., ia, eia, elisa, emit, fpia) and enzymatic methods (e.g., alcohol dehydrogenase)), (2) stable isotope or other universally recognized internal standards in all samples (e.g., to control for matrix effects, interferences and variations in signal strength), and (3) method or drug-specific calibration and matrix-matched quality control material (e.g., to control for instrument variations and mass spectral drift); qualitative or quantitative, all sources, **includes specimen validity testing**, per day; 22 or more drug class(es), including metabolite(s) if performed" (emphasis added).

### 3.    Crawford and Crawford P.C.'s Fraudulent Unbundling

523.    Defendants Crawford and Crawford P.C. also fraudulently unbundled charges in connection with nearly every procedure they claimed to perform.

524.    Procedures billed by Crawford P.C. were primarily routine arthroscopic surgeries to patients' shoulders and knees.

525.    When a procedure is done arthroscopically to repair a condition in a shoulder or knee (or other body part), it is contemplated that the surgeon will evaluate the joint using the arthroscope.

526.    Thus, while the CPT code book contains codes to bill for diagnostic arthroscopies (separate CPT codes for each joint), such codes are not billable in connection with a procedure to repair a condition and are only billable when done as a standalone diagnostic procedure, since exploration of the joint is a necessary part of the repair procedure and included in that charge.

527.    Despite this rule that is clear by both coding guidelines and common sense, Crawford and Crawford P.C. routinely added a separate charge for diagnostic arthroscopies in connection with repair procedures in order to bill Liberty Mutual thousands of dollars more per alleged procedure.

528.    Crawford and Crawford P.C. also fraudulently unbundled charges for substantive components of alleged joint repairs.

529.   For example, Crawford and Crawford P.C. often added a separate charge for debridement to procedures to allegedly repair rotator cuff and labrum tears.

530.   Performing a repair of this type of tear necessarily includes debridement, and therefore the charge for debridement is included in the charge for the repair itself.

531.   Debridement is only separately billable if done to a separate area of the joint to that repaired, which was not done with respect to the patients for whom Crawford and Crawford P.C. added this charge.

532.   Several of the rotator cuff repairs billed by Crawford and Crawford P.C. were billed as open procedures rather than arthroscopies.

533.   When billing for these open rotator cuff repairs, Crawford P.C. invariably submitted separate charges using CPT codes 23412 (to describe the open cuff repair) and 23130 (which is for a partial acromionectomy).

534.   A partial removal of the acromion is necessary to access the rotator cuff during an open repair and is therefore considered a component of the repair, the cost of which is included in the bill for the repair and not a separately billable procedure.

535.   As with the other types of routine fraudulent unbundling used by Crawford and Crawford P.C., separate charges for this necessary component of a rotator cuff repair were submitted despite being expressly prohibited by coding rules

in order to add thousands of dollars in charges for each procedure billed to Liberty Mutual.

536.   Further, Crawford P.C. clearly knew that its charges were improper and unbundled because the surgery center at which these procedures were allegedly done – The Surgical Institute of Michigan, LLC, of which Crawford is an owner – did not bill for the fraudulently unbundled acromionectomies and debridement.

**4.   Fraudulent Unbundling of Physical Therapy and Chiropractic Bills**

537.   As detailed above, all patients of defendant Great Lakes also had bills submitted by defendant Live Well for purported chiropractic services.

538.   Together, the predetermined course of care implemented by Great Lakes, Live Well, and Rodriguez, which was done simultaneously to the same patients on the same dates at the same location, involved chiropractic manipulation treatment, manual therapy, and massage therapy, often with each of these treatments billed on the same date.

539.   Coding guidelines and regulations prohibit manual therapy (CPT code 97140) and massage therapy (CPT code 97124) from being performed on the same patient on the same date.

540.   Great Lakes and Rodriguez routinely billed for both manual therapy and massage therapy to the same patient on the same dates, and these bills were unquestionably fraudulently unbundled.  *See* Exhibit 2.

541. Coding guidelines and regulations also prohibit chiropractic manipulation treatment from being billed at the same time as both manual therapy and massage therapy.

542. The defendants intentionally submitted bills for chiropractic manipulation treatment through Live Well instead of Great Lakes, even though such services were done as part of the same course of treatment, if they were done at all, to avoid detection by claims review systems that may have flagged fraudulent unbundling.

543. All claims submitted by Great Lakes, Live Well, and Rodriguez for chiropractic manipulation, massage, and manual therapy allegedly performed on the same date of service were fraudulently unbundled, and none of these unbundled claims are owed by Liberty Mutual.

### C.   FRAUDULENT USE OF CPT CODE MODIFIERS

544. CPT code modifiers are used to indicate to payors that a service or procedure has been altered by some specific circumstance.

545. The defendants appended CPT code modifiers to their bills for improper reasons to increase charge amounts and to deceive Liberty Mutual into paying bills that violated coding rules and guidelines.

546. The CPT code modifier that was most frequently abused by the defendants was modifier 59, which is used to report that charges that are ordinarily

not permitted to be submitted together are proper because there was a separate patient encounter or procedure on the same date of service.

547.   Appending modifier 59 to CPT codes improperly is a deceptive practice intended to bypass claim adjudication systems that would detect fraudulent unbundling.

548.   Indeed, the federal government has released a publication warning providers that CPT code modifier 59 is overused and is associated with cases of fraud and abuse.

549.   The defendants routinely used modifier 59 in connection with their bills for unbundled urine drug testing components, procedures, physical therapy, chiropractic services, and evaluations that were not allowed to be billed separately for all of the reasons detailed above to falsely claim that an exception to coding rules that would prohibit separate billing of these charges should not apply to their charges, which is precisely the improper use that the government has warned against.

### D.   IMPROPER BILLING DURING GLOBAL SURGERY PERIODS

550.   Billing regulations provide that the cost of many of the injections and procedures billed by the defendants include all necessary services furnished before, during, and after a procedure, in what is referred to as the "global surgery package."

551.   Post-surgery services include subsequent evaluations and pain management related to the surgery.

552.   Periods during which post-surgery services are included in the cost of the procedure vary based on the procedure performed, but are generally either ten (10) days for relatively minor procedures or 90 days for surgeries.

553.   For procedures that include a 90-day global surgery package, the global period includes the day prior to the surgery, the day of the surgery, and 90 days following the surgery.

554.   Even when there is no post-surgery period applicable to a procedure, services performed on the date of a procedure are generally not payable as a separate service.

555.   Northland and Gandhi frequently improperly charged for examinations billed on the same day as purported injections, which is included in the global period for those procedures.

556.   Crawford and Crawford P.C. routinely billed for evaluations done solely as post-surgical follow-up well within the global period of the surgeries for which they billed.

557.   The following patients exemplify these defendants' fraudulent practice of submitting charges for examinations that are included in the global period for procedures:

a.   Northland billed for an alleged left shoulder injection to patient K.S. (Claim No. 043532711) on August 25, 2021, which is a procedure included in the global surgery period that prohibits separate billing for

evaluations on the same day as the procedure, and also billed separately for an evaluation of K.S. that allegedly occurred on the same day.

b.    Crawford P.C. billed for an alleged open-incision rotator cuff repair on patient R.H. (Claim No. 045138759) on April 26, 2021, a procedure for which there is a 90-day global post-surgery period.  Crawford then fraudulently billed for purported examinations of R.H. on May 11, 2021 and June 10, 2021, both of which were well within the global period during which these purported services were covered by the cost of the procedure itself.

## X.    <u>EXCESSIVE AND UNREASONABLE CHARGES</u>

558.  Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

559.  The defendants routinely billed Liberty Mutual at rates that were unreasonable and had no relation to the services allegedly performed.

560.  In each such case, including those described in the following sections, Liberty Mutual was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

561.  Liberty Mutual also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each claim thereby incurring costs.

## A.   EXCESSIVE AND UNREASONABLE CHARGES FOR IMAGING

### 1.   Unreasonable Charges for MRIs

562.   As previously discussed, Northland billed Liberty Mutual for performing numerous MRIs on almost every patient that were not medically necessary in order to generate additional claims for payment under the Michigan No-Fault Act.

563.   Northland also billed Liberty Mutual outrageous amounts for every MRI it allegedly performed, with every MRI at issue billed for at least $4,100 per scan and as much as $5,800 per scan before accounting for any unnecessary ancillary services such as 3D rendering.

564.   In total, Northland has billed Liberty Mutual more than $2,984,226 for purported MRIs just since 2017.

565.   Northland has made various representations to the Michigan Department of Community Health (which is now known as the Michigan Department of Health and Human Services) about its costs to obtain certificates of need ("CON") to obtain mobile MRI host sites.

566.   In the application for an MRI host site that reported the highest costs in the past ten (10) years, Northland and Gandhi claimed that it paid $50,004 to acquire a CON from a separate provider and would pay $426,000 to operate the facility for the following three (3) years, for a total of $142,000 in costs each year.

567. In other documents, Northland represented its costs to be as little as $100,000 per year.

568. By contrast, Northland billed just Liberty Mutual (exclusive of all other auto insurers and other classes of payor to which it submitted bills) an average of nearly than $600,000 per year for the past five (5) years.

569. Northland billed just Liberty Mutual more than four (4) times its total annual costs, which was just a fraction of the total amount billed to all insurers and payors.

570. It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

571. Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

572. Northland's charges for MRIs are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

## 2. **Unreasonable Charges for CT Scans**

573. As previously discussed, Northland routinely billed Liberty Mutual for multiple, medically unnecessary CT scans ordered by its physicians.

574. Northland routinely charged Liberty Mutual between $2,800 and $3,200 for each of the CT scans it allegedly performed on Liberty Mutual insureds.

575.   By way of example, Northland routinely charged $3,100 for CT scans of the head and brain using CPT code 70450, $3,200 for CT scans of the thorax using CPT code 71250, and $2,800 for CT scans of the neck and cervical spine using CPT code 72125.

576.   In comparison, for 2020 the payment rate set by the Centers for Medicare and Medicaid Services ("CMS") for CT scans in the Detroit metropolitan area was $117.03 for CT scans billed using CPT code 70450, $146.84 for CT scans billed using CPT code 71250, and $144.04 for CT scans billed using CPT code 72125.

577.   The CMS payment amounts are indicative of the range of what constitutes a reasonable charge for CT scans.

578.   In other words, the amounts that Northland billed to Liberty Mutual for CT scans were between 1,840% and 2,548% higher than the reasonable charge amounts established by the CMS rates.

579.   The Michigan No-Fault Act requires providers like Northland to charge "a <u>reasonable amount</u> for the treatment."   Mich. Comp. Laws § 500.3157(1) (emphasis added).

580.   Charge that are more than 1800% higher than the maximum charged permitted by the government cannot be reasonable under the Michigan No-Fault Act.

581.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

582.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

583.   Northland's charges are not and were not reasonable and it cannot sustain its burden of proving otherwise.

584.   Liberty Mutual is not required to pay the defendants for CT scans that were not medically necessary, were performed for the purpose of inflating claims to Liberty Mutual, and for which they did not charge Liberty Mutual a reasonable amount.

### B.   EXCESSIVE AND UNREASONABLE DRUG CHARGES

585.   As previously described, Northland prescribed large numbers of medications to patients as part of the defendants' predetermined treatment protocol that were billed by defendant MBMG.

586.   MBMG, in turn, charged Liberty Mutual excessive and unreasonable prices for those medications, at amounts that were frequently many times the retail prices of those medications.

587.   As one example, MBMG routinely billed nearly $2,000 for thirty (30) day supplies of lidocaine patches.

588.   When prescriptions for the same patches were filled by a different pharmacy for patient R.C. (Claim No. 043594967), the charge amount was only $312.27.

589.   Northland also billed outrageous and unreasonable amounts for the injectable drugs allegedly used in connection with pain management procedures.

590.   As detailed above, these charges often included bills for substances not actually used and not separately billable, and the extraordinary total amounts billed by Northland were a result of those fraudulent practices and the incredibly inflated amounts charged.

591.   Omnipaque, the contrast material for which Northland billed $460 per five (5) milliliter use in connection with injections, costs approximately $1 per milliliter to purchase, meaning that Northland billed more than 90 times its cost on each occasion.

592.   Further, Northland billed for using the same contrast material for certain imaging procedures it billed, and it charged less than one-tenth of that amount in such instances.

593.   For example, Northland billed $2,250 for 75 units of contrast material allegedly used in a CT scan of patient R.C. (Claim No. 043594967), which amounts to a charge of just $30 per unit for the same material.

594.   Lidocaine, the local anesthetic for which Northland fraudulently billed $600 per three (3) milliliter use, also costs approximately $1 per milliliter to purchase, meaning that Northland billed approximately 200 times its cost on each occasion.

595.   Other substances allegedly injected, including bupivacaine and kenalog, were charged with similar exponentially inflated charges that had no basis and were done only to maximize the amount realized by the defendants through their fraudulent and unnecessary charges.

596.   For one of the alleged procedures to patient R.C., Northland submitted documentation showing its negotiated reimbursement with Blue Cross/Blue Shield rate for kenalog, which was reimbursed at $3.41 for a bill Northland sought to have Liberty Mutual pay $1,200.

597.   It is simply not tenable that the No-Fault Act permits providers to seek hundreds of times more from automobile insurers than the amounts it contracts for payment from other payors.

598.   Liberty Mutual is not required to pay the defendants for medications prescribed and dispensed for the purpose of inflating claims to Liberty Mutual or for which they did not charge Liberty Mutual a reasonable amount.

C.    **EXCESSIVE AND UNREASONABLE CHARGES FOR DME**

599.    In addition to being unlicensed, medically unnecessary, and issued contrary to applicable standards of care, as discussed *supra*, items of DME billed by Northland and Med Care were charged at unreasonable rates.

600.    As discussed above, the predetermined treatment protocol used by the defendants involved billing for the issuance of DME, including a variety of braces, heating pads, cervical pillows, canes, and other devices.

601.    All of the DME billed by Northland and Med Care was charged at outrageous prices many times higher than the actual cost of these items.

602.    For example, since April 2018, Northland has billed Liberty Mutual for allegedly supplying lumbar braces to patients on at least 58 occasions, for which it always billed at least $1,800 and often billed $2,200.

603.    The retail price of the lumbar braces billed by Northland was less than $200, meaning Northland typically charged Liberty Mutual a price for lumbar braces that was more than ten (10) times higher than the retail cost of that DME.

604.    As another example, Med Care billed Liberty Mutual $500 for a cervical pillow and $350 for a lumbar wedge pillow it allegedly supplied to patient X.A. (Claim No. 042890322) on September 11, 2020.

605.   Each of these items of DME can be purchased for a retail price of well under $100, meaning the prices billed by Med Care were at least three (3) to five (5) times the reasonable retail price of those items of DME.

606.   All of the DME purportedly issued to patients by Northland and Med Care could have been purchased at retail businesses at far lower prices than the amounts billed by these defendants.

607.   DME charged at markups of many times commercially available prices cannot be considered a "reasonable" charge, and the defendants cannot sustain their burden of proving otherwise.

608.   Liberty Mutual is not required to pay the defendants for DME fraudulently billed pursuant to a predetermined treatment protocol, or for which it was charged more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent issuance of DME by Northland and Med Care.

### D.   EXCESSIVE AND UNREASONABLE CHARGES FOR DRUG TESTING

609.   As previously discussed, defendant Pioneer Lab routinely billed Liberty Mutual for both presumptive and definitive drug testing that was not medically necessary and that was never actually ordered.

610.   In addition, Pioneer Lab also charged exorbitant and unreasonable amounts for the testing it allegedly performed.

611.   For example, since July 18, 2019, Pioneer Lab has billed Liberty Mutual for allegedly performing presumptive drug testing using CPT code 80307 ("*Drug test(s), presumptive, any number of drug classes, any number of devices or procedures; by instrument chemistry analyzers, e.g., utilizing immunoassay, chromatography, and mass spectrometry either with or without chromatography*") at least 237 times.  *See* Exhibit 3.

612.   Each time it billed Liberty Mutual for presumptive drug testing, Pioneer Lab charged $1,000.

613.   By way of comparison, the CMS reimbursement rate for presumptive drug testing billed using CPT code 80307 was just $62.14, meaning that Pioneer Lab's charges to Liberty Mutual were 1,509% higher than the amount Medicare will pay for presumptive drug testing properly billed using CPT code 80307.

614.   Charges for drug testing that are more that 1,500% higher than Medicare payment rates cannot possibly be considered "reasonable," and Pioneer Lab cannot sustain its burden of proving otherwise.

615.   Pioneer Lab charged the outrageous amounts described herein, in part, because it monetized its charges before it ever collected payment from insurers.

616.   Pioneer Lab entered into contracts through which it sold its accounts receivable (i.e., the bills submitted to Liberty Mutual) to third parties for a fraction of the amount it demanded from Liberty Mutual.

617. Pioneer Lab's accounts receivable were sold or assigned to several different entities, including Genesis Alternative Finance IV, LLC and AKF, Inc.

618. Liberty Mutual is not required to pay the defendants for drug testing fraudulently ordered and billed pursuant to a predetermined treatment protocol, that was never actually ordered, or for which it was charged more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent billing submitted by Pioneer Lab.

## XI. MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY LIBERTY MUTUAL

### A. MISREPRESENTATIONS BY THE DEFENDANTS

619. To induce Liberty Mutual to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Liberty Mutual false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

620. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

621. Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

622. Thus, every time the defendants submitted bills and medical records to Liberty Mutual supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

623. There are no less than sixteen (16) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Liberty Mutual:

a.    Northland, Great Lakes, Pioneer Lab, Live Well, Med Care, Gandhi, and Rodriguez billed Liberty Mutual for treatment and services that were not actually provided.

b.    MBMG billed for prescription medications it was not licensed to dispense in Michigan.

c.    Crawford P.C. and Med Care billed for DME that they were not licensed to issue in Michigan.

d.    Northland, Great Lakes, Live Well, Gandhi, and Rodriguez implemented a predetermined protocol by which patients were given highly similar treatment plans regardless of their actual medical need in order to maximize the amount charged to Liberty Mutual.

e.    Northland, Great Lakes, Live Well, Gandhi, and Rodriguez fabricated, falsified, and exaggerated diagnoses to create the appearance of medical justification for the services for which they billed Liberty Mutual.

f.   Northland billed for excessive and medically unnecessary imaging, including MRIs and CT scans and purported services ancillary thereto.

g.   Pioneer Lab billed for urine drug testing that was excessive, predetermined, medically unnecessary, and not actually used in any way to guide patient care or medical decision-making.

h.   Northland, Crawford P.C., Gandhi, and Crawford billed for medically unnecessary injections and surgical procedures in violation of applicable standards of care.

i.   Great Lakes, Live Well, and Rodriguez billed for medically unnecessary and excessive courses of chiropractic and physical therapy in violation of applicable standards of care.

j.   Northland ordered and MBMG billed for medically unnecessary medications that had no basis or appropriate use in furtherance of the defendants' predetermined treatment protocol to bill Liberty Mutual for as many services as possible for profit and not based on individual patient need.

k.   Northland, Crawford P.C., Med Care, Gandhi, and Crawford billed for medically unnecessary DME in furtherance of the defendants' predetermined treatment protocol to bill Liberty Mutual for as many services as possible for profit and not based on individual patient need.

l.   Northland, Crawford P.C., Gandhi, and Crawford submitted claims representing that purported patient encounters were more complex than they actually were, which is a fraudulent billing practice known as upcoding.

m.   Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., Gandhi, Rodriguez, and Crawford submitted claims using multiple CPT codes to describe the same services allegedly performed, which is a fraudulent billing practice known as unbundling.

n.   The defendants abused and misused CPT code modifiers to intentionally bill Liberty Mutual using fraudulent billing practices and to attempt to avoid detection of the same by bill reviewers.

o.   Northland, Crawford P.C., Gandhi, and Crawford submitted separate bills for services included in global surgery packages.

p.   Northland, Pioneer Lab, MBMG, Med Care, and Gandhi submitted bills at rates that had no basis and were many times higher than reasonable to charge for services, if such services were rendered at all.

624.   As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

625.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

626.   The foregoing facts – including billing for services not rendered, billing for treatment without a license, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of treatment and testing – were not, and could not have been, known to Liberty Mutual until it commenced its investigation of the defendants shortly before the filing of this action.

627.   The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful.

628.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 7.

629.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Liberty Mutual by, on behalf of,

or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

630.   Moreover, each HICF submitted to Liberty Mutual by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

631.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Liberty Mutual via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, medications, DME, and ancillary services for which they billed Liberty Mutual.

632.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Liberty Mutual constitutes a material misrepresentation.

### B.  LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE

633.  The facially valid documents submitted to Liberty Mutual by the defendants were designed to, and did in fact, induce Liberty Mutual to rely on the documents.

634.  At all relevant times, the defendants concealed from Liberty Mutual facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Liberty Mutual from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

635.  These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

636.  Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Liberty Mutual began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

637.  Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Liberty Mutual did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

638.   In reliance on the defendants' misrepresentations, Liberty Mutual paid money to the defendants to its detriment.

639.   Liberty Mutual would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

640.   As a result, Liberty Mutual has paid in excess of $1,404,320 to the defendants as a result of the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.   **MAIL AND WIRE FRAUD RACKETEERING ACTIVITY**

641.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

642.   The objective of the scheme to defraud Liberty Mutual, which occurred throughout the period set out in Exhibits 1 through 7, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not actually and lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

643.   This objective necessarily required the submission of bills for payment to Liberty Mutual.

644.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

645.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

646.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Liberty Mutual in California.

647.   Liberty Mutual received all medical records and bills faxed to it by the defendants in California.

648.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

649.   It was foreseeable to the defendants that faxing bills and medical records to Liberty Mutual would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Liberty Mutual.

650.   Every payment at issue in this Complaint where Liberty Mutual was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Liberty Mutual using the U.S. Mail.

651.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

652.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 8.

653.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Liberty Mutual via fax or mail related to each exemplar patient discussed in this Complaint.

654.   It was within the ordinary course of business for Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, and Med Care (by and through Gandhi, Rodriguez, and Crawford) to submit claims for No-Fault payment to insurance carriers like Liberty Mutual through faxes and the U.S. Mail.

655.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein (by and through Gandhi, Rodriguez, and Crawford) is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

656.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the entity defendants.

657.   The entity defendants, at the direction and with the knowledge of their owners and managers (including defendants Gandhi, Rodriguez, and Crawford), continue to submit claims for payment to Liberty Mutual and, in some instances, continue to commence litigation against Liberty Mutual seeking to collect on unpaid claims.

658.   Thus, the defendants' commission of mail and wire fraud continues.

659.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

660.   As several of the defendants named herein (namely, those defendants who conducted the Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., and MBMG RICO enterprises) agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

661.   Liberty Mutual reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 through 7 annexed hereto and identified in the exemplar patients above.

662.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Liberty Mutual's damages.

## XIII. <u>DAMAGES</u>

663.   The pattern of fraudulent conduct by the defendants injured Liberty Mutual in its business and property by reason of the aforesaid violations of law.

664.   Although it is not necessary for Liberty Mutual to calculate damages with specificity at this stage in the litigation, and Liberty Mutual's damages continue to accrue, Liberty Mutual's injury includes, but is not limited to, compensatory damages in excess of $1,404,320.

665.   Exhibit 9 (Northland), Exhibit 10 (Great Lakes), Exhibit 11 (Pioneer Lab), Exhibit 12 (Live Well), Exhibit 13 (Crawford P.C.), Exhibit 14 (MBMG), and Exhibit 15 (Med Care) annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Liberty Mutual to the defendants by date, payor, patient initials, patient claim number, check number, and amount.

666.   Liberty Mutual's claim for compensatory damages, as set out in Exhibits 9 through 15, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

667.   Every payment identified in Exhibits 9 through 15 was made by Liberty Mutual alone.

668.   Moreover, every payment identified in Exhibits 9 through 15 derives from a check sent by Liberty Mutual to the defendants through the U.S. Mail.

669.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Liberty Mutual rely on such documents and mail payment in response thereto.

670.   Liberty Mutual also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

671.   Liberty Mutual investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV. <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Northland Enterprise)**
**Against Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP;**
**Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business**
**Management Group Inc.; Med Care Wellness, Inc.; Milan Gandhi; Giovanni**
**Rodriguez; and Kevin Crawford, D.O.**

672. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

673. Northland constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

674. In connection with each of the claims identified in the within Complaint, defendants Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, Med Care, Gandhi, Rodriguez, and Crawford ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Northland, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Northland's business, or should have reasonably foreseen that the mailing of such false medical documentation by Northland would occur, in furtherance of the Count I defendants' scheme to defraud.

675. The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates,

including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

676. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Northland, which they knew would be billed by Northland, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

677. Gandhi owned, managed, and controlled Northland and was responsible for all actions taken by Northland and its staff.

678. Great Lakes, Live Well, and Rodriguez exaggerated diagnoses and billed for unnecessary and extensive courses of treatment of Northland patients to create the appearance of injuries that were more severe than they were and to create the appearance that conservative treatment did not relieve alleged complaints in order to create the appearance that the imaging, office visits, diagnostic testing, and invasive procedures billed by Northland were medically necessary.

679. Pioneer received patient referrals from Northland and billed Liberty Mutual for medically unnecessary testing ordered by Northland that was used to create the appearance that Northland was performing lawful and necessary treatment

to the patients at issue herein and that gave the false appearance that patients needed treatment from Northland that allowed Northland to continue billing Liberty Mutual.

680.  Crawford P.C. and Crawford billed for surgical procedures to patients of Northland that were unnecessary and were used by Northland to create the appearance of necessity of ongoing evaluations, treatment, imaging, and testing for which it billed Liberty Mutual.

681.  MBMG and Med Care billed for unnecessary medications and DME that were used by Northland to create the appearance of medical necessity for the lengthy courses of evaluation and purported services billed to Liberty Mutual by Northland.

682.  The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Northland to continue billing for unlawful and medically unnecessary services.

683.  As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Northland for the benefit of the Count I defendants that would not otherwise have been paid.

684.  The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

685.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Northland Enterprise)**
**Against Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP; Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business Management Group Inc.; Med Care Wellness, Inc.; Milan Gandhi; Giovanni Rodriguez; and Kevin Crawford, D.O.**

686.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

687.   Defendants Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, Med Care, Gandhi, Rodriguez, and Crawford ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Northland.

688.   The Count II defendants each agreed to further, facilitate, support, and operate the Northland enterprise.

689.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

690.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Northland even though Northland was not eligible to collect such payments by virtue of its unlawful conduct.

691.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

692.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

693.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Great Lakes Enterprise)
### Against Northland Radiology, Inc.; Live Well Health, LLC; Milan Gandhi;
### and Giovanni Rodriguez

694.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

695.   Great Lakes constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

696.   In connection with each of the claims identified in the within Complaint, defendants Northland, Live Well, Gandhi, and Rodriguez ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Great Lakes, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Great Lakes's business, or should have reasonably foreseen that the mailing of such false medical documentation by Great Lakes would occur, in furtherance of the Count III defendants' scheme to defraud.

697.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

698.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Great Lakes, which they knew would be billed by Great Lakes, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

699.   Rodriguez owned, managed, and controlled Great Lakes and was responsible for all actions taken by Great Lakes and its staff.

700.   Northland and Gandhi were responsible for making exaggerated and unsupported diagnoses and ordering medically unnecessary services based thereon, including services billed to Liberty Mutual by Great Lakes.

701.   Live Well coordinated chiropractic and physical therapy treatment with Great Lakes and split bills for services to improperly avoid detection of fraudulent unbundling.

702.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Great Lakes to continue billing for unlawful and medically unnecessary services.

703.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued

payment drafts to Great Lakes for the benefit of the Count III defendants that would not otherwise have been paid.

704.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

705.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Great Lakes Enterprise)
### Against Northland Radiology, Inc.; Live Well Health, LLC; Milan Gandhi; and Giovanni Rodriguez

706.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

707.   Defendants Northland, Live Well, Gandhi, and Rodriguez ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Great Lakes.

708.   The Count IV defendants each agreed to further, facilitate, support, and operate the Great Lakes enterprise.

709.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

710.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Great Lakes even though Great Lakes was not eligible to collect such payments by virtue of its unlawful conduct.

711.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

712.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

713.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Pioneer Lab Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

714.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

715.   Pioneer Lab constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

716.   In connection with each of the claims identified in the within Complaint, defendants Northland and Gandhi ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Pioneer Lab, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Pioneer Lab's business, or should have reasonably foreseen that the mailing of such false medical documentation by Pioneer Lab would occur, in furtherance of the Count V defendants' scheme to defraud.

717.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

718.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for urine drug testing services that were purportedly

performed by Pioneer Lab, which they knew would be billed by Pioneer Lab, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

719.    Northland and Gandhi were responsible for supplying Pioneer Lab with physician orders and requisition forms for medically unnecessary drug testing that were used by Pioneer Lab to generate charges to Liberty Mutual.

720.    The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Pioneer Lab to continue billing for unlawful and medically unnecessary services, if provided at all.

721.    As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Pioneer Lab for the benefit of the Count V defendants that would not otherwise have been paid.

722.    The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

723.    By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Pioneer Lab Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

724.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

725.   Defendants Northland and Gandhi ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Pioneer Lab.

726.   The Count VI defendants each agreed to further, facilitate, support, and operate the Pioneer Lab enterprise.

727.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

728.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Pioneer Lab even though Pioneer Lab was not eligible to collect such payments by virtue of its unlawful conduct.

729.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of patients, ordering unnecessary urine drug testing, and the creation and

submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

730. Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

731. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Live Well Enterprise)
### Against Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC; Milan Gandhi; and Giovanni Rodriguez

732. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

733. Live Well constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

734.   In connection with each of the claims identified in the within Complaint, defendants Northland, Great Lakes, Gandhi, and Rodriguez ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Live Well, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Live Well's business, or should have reasonably foreseen that the mailing of such false medical documentation by Live Well would occur, in furtherance of the Count VII defendants' scheme to defraud.

735.   The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

736.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by Live Well, which they knew would be billed by Live Well, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

737.   Rodriguez owned, managed, and controlled Live Well and was responsible for all actions taken by Live Well and its staff.

738.   Northland and Gandhi were responsible for making exaggerated and unsupported diagnoses and ordering medically unnecessary services based thereon, including services billed to Liberty Mutual by Live Well.

739.   Great Lakes coordinated chiropractic and physical therapy treatment with Live Well and split bills for services to improperly avoid detection of fraudulent unbundling.

740.   The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Live Well to continue billing for unlawful and medically unnecessary treatment, if provided at all.

741.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Live Well for the benefit of the Count VII defendants that would not otherwise have been paid.

742.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

743.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Live Well Enterprise)
### Against Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC; Milan Gandhi; and Giovanni Rodriguez

744.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

745.   Defendants Northland, Great Lakes, Gandhi, and Rodriguez ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Live Well.

746.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Live Well enterprise.

747.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

748.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Live Well even though Live Well was not eligible to collect such payments by virtue of its unlawful conduct.

749.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of patients and the creation and submission to Liberty Mutual of

insurance claim and medical record documents containing material misrepresentations.

750. Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

751. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Crawford P.C. Enterprise)
### Against Northland Radiology, Inc.; Milan Gandhi; and Kevin Crawford, D.O.

752. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

753. Crawford P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

754. In connection with each of the claims identified in the within Complaint, defendants Northland, Gandhi, and Crawford ("Count IX defendants")

intentionally caused to be prepared, faxed, and mailed false medical documentation by Crawford P.C., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Crawford P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Crawford P.C. would occur, in furtherance of the Count IX defendants' scheme to defraud.

755. The Count IX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

756. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for services that were purportedly performed by Crawford P.C., which they knew would be billed by Crawford P.C. in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

757. Crawford owned and controlled Crawford P.C. and was responsible for all actions taken by it and its staff.

758.   Northland and Gandhi were responsible for referring patients to Crawford P.C. based on exaggerated and fabricated evaluations and diagnoses for evaluations and services that were medically unnecessary.

759.   The Count IX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Crawford P.C. to continue billing for unlawful and medically unnecessary services, if provided at all.

760.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Crawford P.C. for the benefit of the Count IX defendants that would not otherwise have been paid.

761.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

762.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Crawford P.C. Enterprise)
### Against Northland Radiology, Inc.; Milan Gandhi; and Kevin Crawford, D.O.

763.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

764.   Defendants Northland, Gandhi, and Crawford ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Crawford P.C.

765.   The Count X defendants each agreed to further, facilitate, support, and operate the Crawford P.C. enterprise.

766.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

767.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Crawford P.C. even though Crawford P.C. was not eligible to collect such payments by virtue of its unlawful conduct.

768.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including making unnecessary referrals to Crawford P.C. and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

769.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make

insurance payments as a result of the Count X defendants' unlawful conduct described herein.

770.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(MBMG Enterprise)**
**Against Northland Radiology, Inc. and Milan Gandhi**

771.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

772.   MBMG constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

773.   In connection with each of the claims identified in the within Complaint, defendants Northland and Gandhi ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by MBMG, or knew that such false medical documentation would be faxed and mailed in the ordinary course of MBMG's business, or should have reasonably foreseen that the

mailing of such false medical documentation by MBMG would occur, in furtherance of the Count XI defendants' scheme to defraud.

774. The Count XI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 8.

775. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical goods and services that were purportedly provided by MBMG, which they knew would be billed by MBMG in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

776. Northland and Gandhi were responsible for the orders for the prescriptions that allowed MBMG to submit bills to Liberty Mutual for medically unnecessary medications.

777. The Count XI defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted MBMG to continue to bill for unlawful and medically unnecessary medications, if dispensed at all.

778.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to MBMG for the benefit of the Count XI defendants that would not otherwise have been paid.

779.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

780.   By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(MBMG Enterprise)**
**Against Northland Radiology, Inc. and Milan Gandhi**

781.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

782.   Defendants Northland and Gandhi ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of MBMG.

783.   The Count XII defendants each agreed to further, facilitate, support, and operate the MBMG enterprise.

784.   As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

785.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of MBMG even though MBMG was not eligible to collect such payments by virtue of its unlawful conduct.

786.   The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including ordering unnecessary medications and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

787.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

788.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Med Care Enterprise)**
**Against Northland Radiology, Inc. and Milan Gandhi**

789.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

790.   Med Care constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

791.   In connection with each of the claims identified in the within Complaint, defendants Northland and Gandhi ("Count XIII defendants") intentionally caused to be prepared and mailed false medical documentation by Med Care, or knew that such false medical documentation would be mailed in the ordinary course of Med Care's business, or should have reasonably foreseen that the mailing of such false medical documentation by Med Care would occur, in furtherance of the Count XIII defendants' scheme to defraud.

792.   The Count XIII defendants knew that two (2) or more mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

793.   As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical goods and services that were purportedly

provided by Med Care, which they knew would be billed by Med Care in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

794.   Northland and Gandhi were responsible for the orders for the prescriptions that allowed Med Care to submit bills to Liberty Mutual for medically unnecessary DME.

795.   The Count XIII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Med Care to continue to bill for unlawful and medically unnecessary DME, if issued at all.

796.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to Med Care for the benefit of the Count XIII defendants that would not otherwise have been paid.

797.   The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

798.   By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Med Care Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

799.  Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

800.  Defendants Northland and Gandhi ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of Med Care.

801.  The Count XIV defendants each agreed to further, facilitate, support, and operate the Med Care enterprise.

802.  As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

803.  The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of Med Care even though Med Care was not eligible to collect such payments by virtue of its unlawful conduct.

804.  The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including ordering unnecessary DME and the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

805.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count XIV defendants' unlawful conduct described herein.

806.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**COMMON LAW FRAUD**
**Against All Defendants**

807.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

808.   The scheme to defraud perpetrated by Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, Med Care, Gandhi, Rodriguez, and Crawford ("Count XV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

809.   The misrepresentations of fact made by the Count XV defendants include, but are not limited to, those material misrepresentations discussed in section XI.A, *supra*.

810.   The Count XV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

811.   The misrepresentations were intentionally made by the Count XV defendants in furtherance of their scheme to defraud Liberty Mutual by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Liberty Mutual.

812.   The Count XV defendants' misrepresentations were known to be false and were made for the purpose of inducing Liberty Mutual to make payments for claims that are not compensable under Michigan law.

813.   Liberty   Mutual   reasonably   relied   upon   such   material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

814.   As a direct and proximate result of the defendants' fraudulent representations and acts, Liberty Mutual has been damaged in its business and property as previously described herein.

**COUNT XVI**
**CIVIL CONSPIRACY**
**Against All Defendants**

815.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

816.   Defendants Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, Med Care, Gandhi, Rodriguez, and Crawford ("Count XIV defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Liberty Mutual by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

817.   The Count XVI defendants worked together to achieve an unlawful purpose (namely, defrauding Liberty Mutual for personal gain).

818.   This purpose was known to all of the Count XVI defendants and intentionally pursued.

819.   Indeed, as detailed above, the Count XVI defendants engaged in inter-referrals to each other of patients for unnecessary treatment and testing so that each could submit improper bills to Liberty Mutual.

820.   Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XVI defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Liberty Mutual seeking payment.

821.   As a result of, and in reasonable reliance on, the false medical documentation submitted by the defendants, Liberty Mutual paid certain of the claims submitted.

822.   All of the Count XVI defendants directly benefited from the payments made to Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, and Med Care.

823.   All of the Count XVI defendants actively and intentionally partook in a scheme to defraud Liberty Mutual and also encouraged and aided other Count XVI defendants in the commission of acts done for the benefit of all Count XVI defendants and to the unjustified detriment of Liberty Mutual.

824.   Accordingly, all of the Count XVI defendants are equally liable for the fraud perpetrated on Liberty Mutual pursuant to their conspiracy.

## COUNT XVII
**PAYMENT UNDER MISTAKE OF FACT**
**Against Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC;**
**Pioneer Lab Houston LP; Live Well Health, LLC; Kevin T. Crawford, D.O.,**
**P.C.; Michigan Business Management Group Inc.; and Med Care**
**Wellness Inc.**

825.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

826.   Liberty Mutual paid the amounts described herein and itemized in Exhibits 9 through 15 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Liberty Mutual by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, and Med Care ("Count XVII defendants").

827.   Liberty Mutual sustained damages by paying under a mistake of fact the claims submitted by the Count XVII defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

828.   The Count XVII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Liberty Mutual under a mistake of fact.

829.   Liberty Mutual is entitled to restitution from each of the Count XVII

defendants, individually and jointly, for all monies paid to and/or received by them

from Liberty Mutual.

830.   The Count XVII defendants' retention of these payments would violate

fundamental principles of justice, equity, and good conscience.

**COUNT XVIII**
**UNJUST ENRICHMENT**
**Against All Defendants**

831.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference

paragraphs 1 through 671 set forth above as if fully set forth herein.

832.   Defendants Northland, Great Lakes, Pioneer Lab, Live Well, Crawford

P.C., MBMG, Med Care, Gandhi, Rodriguez, and Crawford ("Count XVIII

defendants") submitted, caused to be submitted, or benefited from claims submitted

to Liberty Mutual that caused Liberty Mutual to pay money, in reasonable belief that

it was legally obligated to make such payments based upon the defendants'

fraudulent misrepresentations.

833.   Liberty Mutual's payments constitute a benefit which the Count XVIII

defendants aggressively sought and voluntarily accepted.

834.   The Count XVIII defendants wrongfully obtained or benefited from

payments from Liberty Mutual through the fraudulent scheme detailed herein.

835.   The Count XVIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

836.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 671 set forth above as if fully set forth herein.

837.   Defendants Northland, Great Lakes, Pioneer Lab, Live Well, Crawford P.C., MBMG, Med Care, Gandhi, Rodriguez, and Crawford ("Count XIX defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

838.   The Count XIX defendants also billed for services not rendered.

839.   The Count XIX defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating claims to Liberty Mutual, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

840.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

841.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

842.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.  Mich. Comp. Laws §§ 500.3157(1).

843.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

844.   The Count XIX defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Liberty Mutual, and other claims remain pending with Liberty Mutual.

845.   The Count XIX defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Liberty Mutual has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XIX defendants for any or all of the reasons set out in the within Complaint.

846.   Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

847.   Liberty Mutual also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Liberty Mutual at all relevant times.

848.   As such, the Count XIX defendants have no standing to submit, pursue, or receive benefits or any other payment from Liberty Mutual, and Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants cannot seek payment from Liberty Mutual for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

849.   Liberty Mutual further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants cannot balance bill or otherwise seek payment from any person insured under a Liberty

Mutual policy or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.   **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs LM General Insurance Company, LM Insurance Corporation, Liberty Mutual Personal Insurance Company, and Safeco Insurance Company of Illinois respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Northland Enterprise)**
**Against Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP; Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business Management Group Inc.; Med Care Wellness, Inc.; Milan Gandhi; Giovanni Rodriguez; and Kevin Crawford, D.O.**

(a)   AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Northland Enterprise)**
**Against Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP;**
**Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business**
**Management Group Inc.; Med Care Wellness, Inc.; Milan Gandhi; Giovanni**
**Rodriguez; and Kevin Crawford, D.O.**

(a)      AWARD Liberty Mutual its actual and consequential damages in an

amount to be determined at trial;

(b)      AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Liberty Mutual injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Great Lakes Enterprise)**
**Against Northland Radiology, Inc.; Live Well Health, LLC; Milan Gandhi;**
**and Giovanni Rodriguez**

(a)      AWARD Liberty Mutual its actual and consequential damages in an

amount to be determined at trial;

(b)      AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Liberty Mutual injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Great Lakes Enterprise)
**Against Northland Radiology, Inc.; Live Well Health, LLC; Milan Gandhi; and Giovanni Rodriguez**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Pioneer Lab Enterprise)
**Against Northland Radiology, Inc. and Milan Gandhi**

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Pioneer Lab Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Live Well Enterprise)
### Against Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC; Milan Gandhi; and Giovanni Rodriguez

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Live Well Enterprise)
### Against Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC;
### Milan Gandhi; and Giovanni Rodriguez

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Crawford P.C. Enterprise)
### Against Northland Radiology, Inc.; Milan Gandhi; and Kevin Crawford, D.O.

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

166

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Crawford P.C. Enterprise)
### Against Northland Radiology, Inc.; Milan Gandhi; and Kevin Crawford, D.O.

(a)      AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (MBMG Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

(a)      AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (MBMG Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Med Care Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

(a)    AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Med Care Enterprise)
### Against Northland Radiology, Inc. and Milan Gandhi

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XVI
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XVII
### PAYMENT UNDER MISTAKE OF FACT
**Against Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP; Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business Management Group Inc.; and Med Care Wellness Inc.**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVIII
### UNJUST ENRICHMENT
**Against All Defendants**

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIX
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

(a)     DECLARE that Liberty Mutual has no obligation to pay pending and previously-denied insurance claims submitted by Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP; Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business Management Group Inc.; Med

Care Wellness, Inc.; Milan Gandhi; Giovanni Rodriguez; and Kevin Crawford, D.O., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP; Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business Management Group Inc.; Med Care Wellness, Inc.; Milan Gandhi; Giovanni Rodriguez; and Kevin Crawford, D.O., jointly and severally, cannot seek payment from Liberty Mutual pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Northland Radiology, Inc.; Great Lakes Pain & Injury Centers LLC; Pioneer Lab Houston LP; Live Well Health, LLC; Kevin T. Crawford, D.O., P.C.; Michigan Business Management Group Inc.; Med Care Wellness, Inc.; Milan Gandhi; Giovanni Rodriguez; and Kevin Crawford, D.O., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

XVI.     <u>**DEMAND FOR JURY TRIAL**</u>

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____
Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
Brian M. Epstein
bepstein@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  September 20, 2022          *Attorneys for Plaintiffs*